W. J. HOBBS et al., Plaintiffs-Appellants,

v.

Mayor Ronnie **THOMPSON** et al.,
Defendants-Appellees.

No. 30704.

United States Court of Appeals,
Fifth Circuit.

Sept. 16, 1971.

federal intervention. After threading our way, we hope cautiously, through recent Supreme Court federal jurisdictional embroidery, we find a constitutional malady and reverse the trial court's judgment which found the Macon provisions constitutionally sound.

## I.

Section 79, Rule 2, of the Macon city charter, and section 2–127 of the city's municipal ordinances, provide that no employee of the city's fire department

"shall take an active part in any primary or election, and all [such] employees are hereby prohibited from contributing any money to any candidate, soliciting votes or prominently identifying themselves in a political race with or against any candidate for office."

Failure to abide by these proscriptions shall subject the employee

"to reprimand, deduction of pay, suspension from duty, reduction in rank, dismissal from the department (or) any one or more of said penalties according to the nature and aggravation of his offense. * * *" Section 2–145.[1]

Pursuant to this legislative authority the Macon city administration insisted that various individual firemen, including plaintiff Hobbs, remove from their automobiles bumper stickers which evidenced support for a particular candidate in the state's General Assembly primary election. After two firemen were temporarily relieved from duty, all of the firemen ordered to remove their bumper stickers did so under protest. Subsequently, on September 8, 1970, plaintiffs, members of the Macon fire department and Local 634 of the International Association of Firefighters, filed a complaint in federal district court on behalf of themselves and other "members and employees of the Macon Fire Department." Jurisdiction was asserted

David L. Mincey, Charles A. Mobley, Deryl D. Dantzler, Macon, Ga., for plaintiffs-appellants; Mincey, Kenmore & Bennett, Macon, Ga., of counsel.

Lawton Miller, City Atty., Macon, Ga., for defendants-appellees.

Before WISDOM, Circuit Judge, DAVIS,* Judge, and GOLDBERG, Circuit Judge.

GOLDBERG, Circuit Judge:

The City of Macon, Georgia, by ordinance, cast a political pall over the electioneering activities of its firemen and policemen. A class composed of Macon firemen, contending that Macon's legislative scheme renders them politically impotent in derogation of their rights under the First Amendment, pleads for

---

* Honorable Oscar H. Davis, U. S. Court of Claims, sitting by designation.

1. Rule 2 of Section 79 also applies to employees of the Macon police department but no member of that department is a party to the present proceedings.

under 28 U.S.C.A. § 1343(3),[2] based upon a cause of action under 42 U.S.C.A. § 1983.[3] The gist of the complaint was that the charter and ordinance provisions which were being enforced against the plaintiffs and the members of their class were unconstitutional in violation of the First Amendment and the due process and equal protection clauses of the Fourteenth Amendment. Plaintiffs prayed for a declaration that the relevant portions of the ordinance and charter were both unconstitutional on their face and as applied and also sought a permanent injunction enjoining defendants, consisting of the Mayor, Aldermen, members of the Aldermanic Fire Committee, Chief and District Chief of the Fire Department, and State Attorney General, from enforcing the applicable Macon legislative provisions.

The Attorney General of Georgia was subsequently dismissed as a party on his unopposed motion, but a motion of the other defendants for dismissal of the complaint for failure to state a claim upon which relief could be granted was denied. Proceeding to the merits, the district court upon the basis of stipulated facts held that the challenged ordinance and charter provisions were both facially constitutional and constitutionally appli-

ed. While we agree that the district court properly entertained plaintiffs' request for federal relief, we disagree with the determination below that the Macon scheme passes constitutional muster.

## II.

■ The merits of the present controversy raise intriguing and significant problems. However, as a threshold issue, we must determine the propriety of federal equitable intervention, especially in light of recent Supreme Court decisions which have seemingly curtailed the role of federal courts in granting anticipatory relief against state or local action.

The district court, while noting that "it would seem desirable and preferable that * * * litigation attacking municipal ordinances and state statutes, particularly statutes with purely local application, be instituted in state courts," nevertheless held that it was compelled to reach the merits under the teaching of *Dombrowski*[4] and its progeny.[5] At the time the district court made this ruling, it was clearly correct in light of our relevant decisions.[6] However, since the district court handed down its decision, the Supreme Court has rendered its decisions in the Younger v. Harris sextet[7] and Askew v. Hargrave, 1971,

---

2. Section 1343(3) provides:
 "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 * * * * *
 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"

3. Section 1983 provides:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

4. Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22.

5. E. g., Cameron v. Johnson, 1968, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182; Zwickler v. Koota, 1967, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444.

6. For example, see the discussion in LeFlore v. Robinson, 5 Cir. 1970, 434 F.2d 933, an opinion which was subsequently withdrawn on rehearing, 446 F.2d 715. See also Davis v. Francois, 5 Cir. 1968, 395 F.2d 730.

7. The Supreme Court's "February sextet," see LeFlore v. Robinson, supra, 446 F.2d at 718 (Goldberg, J., concurring), consisted of Younger v. Harris, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669; Samuels v. Mackell, 1971, 401 U.S. 66,

401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196. The relevance of those decisions to the instant case compels us to consider anew the proper role of a federal district court when asked to grant equitable relief against state or municipal ordinances which allegedly infringe First Amendment rights and to determine whether those cases have any forbidding tones or notes to initial federal adjudication of the Macon scheme. Upon examination we conclude that those decisions, while they represent important pronouncements concerning restraint in federal intervention, do not preclude federal consideration of the issues raised in the present case. In order to understand our holding it is necessary to examine in some detail the prior law governing federal relief in First Amendment cases, for it is against the mosaic of this background that the precise contours of *Younger* and *Askew* must be shaped. This jurisprudential story is one of tension between the overbreadth doctrine with its emphasis upon accelerated relief, and long-held countervailing equitable notions of deference to state processes.

### A. The Policies of the Overbreadth Doctrine

The plaintiffs' primary complaint is that the Macon ordinance and charter provisions in question are on their face unconstitutionally vague and overbroad.

At least as early as 1940, in response to the favored status of rights to expression and association in our constitutional scheme, the Supreme Court developed what has become known as the overbreadth doctrine.[8] *See, e. g.,* Cantwell v. Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. This method of adjudication, wherein the courts review a

particular law on its face without regard to the constitutional status of a particular claimant's conduct, is based on the principle that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." Zwickler v. Koota, 1967, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444, quoting NAACP v. Alabama ex rel. Flowers, 1964, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325. Facial overbreadth scrutiny emphasizes the need to eliminate an overbroad law's deterrent impact on constitutionally protected expressive activity. Dombrowski v. Pfister, *supra.* "Chilling effect" is a short-hand way of describing this vice of an overbroad law. Since by definition an overbroad statute covers some privileged as well as non-privileged activity, the statutory burden operates as a disincentive to action and creates an *in terrorem* effect on conduct within the protection of the First Amendment. In the area of speech, the vagueness doctrine, based upon the principle that a statute must not forbid or require "the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," Connally v. General Constr. Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L. Ed. 322, reflects this same concern. Lack of fair warning to actors or lack of adequate standards to guide enforcers also may lead to a "chill" on privileged activity. A person contemplating action who might be covered by a vague statute is left in doubt as to whether he is covered by the statute and, if so, whether his claim of privilege will be upheld. *See, e. g.,* NAACP v. Button, 1963, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d

91 S.Ct. 764, 27 L.Ed.2d 688; Boyle v. Landry, 1971, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696; Perez v. Ledesma, 1971, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701; Dyson v. Stein, 1971, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781; and Byrne v. Karalexis, 1971, 401 U.S. 216, 91 S. Ct. 777, 27 L.Ed.2d 792.

8. For a discussion of the theoretical principles underlying the overbreadth doctrine, see Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970).

405. *See also* Coates v. Cincinnati, 1971, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214.

Rather than await case-by-case excision of a statute's overbreadth or vagueness through review of its application to particular conduct, which would be needlessly time-consuming and ineffective, courts, under the rubric of the overbreadth doctrine, invalidate the statute facially so as to end its deterrence of constitutionally protected activity. Simply to review a statute as applied to the conduct of a particular claimant, while it might permit that individual to escape the statutory burden, would permit the overbroad law to remain as a deterrent to others who, because of fear of statutory reprisals, might forego protected activity rather than test their privilege administratively or judicially.

The overbreadth doctrine, therefore, focuses directly on the need for precision in legislative draftmanship to avoid conflict with First Amendment rights. Even though the interests a statute promotes may justify some infringement upon First Amendment rights, the overbreadth doctrine condemns those means to that legitimate · end which comprehend too broad an incursion upon the realm of First Amendment activity.

Where a law is substantially overbroad, in that it sweeps within its scope a wide range of both protected and non-protected expressive activity, and where no "readily apparent construction suggests itself as a vehicle for rehabilitating the statute in a single [proceeding]," Dombrowski v. Pfister, *supra*, 380 U.S. at 491, 85 S.Ct. at 1123, courts have rejected simple interest balancing and have required the legislature to achieve its ends by "less drastic means." Shelton v. Tucker, 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231; *accord*, United States v. Robel, 1967, 389 U.S. 258, 268 n. 20, 88 S.Ct. 419, 19 L.Ed.2d 508.

**B. Countervailing Policies of Restraint**

Appreciation of the "chill" on primary conduct, which lies at the heart of the overbreadth and vagueness doctrines, often leads to direct conflict with traditional notions of restraint in the exercise of federal anticipatory relief. As developed above, the policy thrust of the overbreadth doctrine has had sufficient force to modify general conceptions of standing and ripeness which are reflected in what one commentator has termed "as applied adjudication" [9]—constitutional review judged in terms of the result worked by a statute's application in a particular case.[10] Prior to *Younger* and *Askew*,

---

9. Note, The First Amendment Overbreadth Doctrine, supra, at 844 (*passim*).

10. This modification was expressly noted by Mr. Justice Brennan in *Dombrowski*: "Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser. Cf. Garrison v. [State of] Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215, 216, 13 L.Ed.2d 125, 132, 133. For example, we have consistently allowed attacks on overly broad statutes with no requirement that the person making attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. Thornhill v. [State of] Alabama, 310 U.S. 88, 97–98, 60 S.Ct.

736, 741–742, 84 L.Ed. 1093, 1099, 1100; NAACP v. Button, supra, 371 U.S., at 432–433, 83 S.Ct., at 337–338, 9 L.Ed.2d at 417, 418; cf. Aptheker v. Secretary of State, 378 U.S. 500, 515–517, 84 S.Ct. 1659, 1668–1669, 12 L.Ed.2d 992, 1002, 1003; United States v. Raines, 362 U.S. 17, 21–22, 80 S.Ct. 519, 522–523, 4 L.Ed.2d 524, 529. We have fashioned this exception to the usual rules governing standing, see United States v. Raines, supra, because of the ' * * * danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.' NAACP v. Button, supra, 371 U.S., at 433, 83 S.Ct., at 338, 9 L. Ed.2d at 418. If the rule were otherwise, the contours of regulation would have to be hammered out case by case —and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation.

the doctrine had also led to some relaxation of those non-constitutional barriers of federal intervention found in the doctrines of exhaustion of state remedies, abstention, and comity restraints against federal interference with state proceedings.

### 1. *Exhaustion of State Remedies.*

■ Exhaustion of adequate state remedies as a prerequisite to a federal court considering a case on its merits is, in the words of Judge Wisdom, "a jurisdictional or a pseudo-jurisdictional requirement." Moreno v. Henckel, 5 Cir. 1970, 431 F.2d 1299. Usually raised in the context of *administrative* remedies, some commentators have urged that a form of the doctrine be extended to state *judicial* remedies in cases arising under the Civil Rights Act of 1871, 42 U.S.C.A. § 1983, the cause of action upon which the present ·case is based. *E. g.*, Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, 82 Harv.L. Rev. 1486 (1969).[11] However, as we specifically held in Hall v. Garson, 5 Cir. 1970, 430 F.2d 430, and reaffirmed in Moreno v. Henckel, *supra*, based upon a reading of Monroe v. Pape, 1961, 365 U. S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, exhaustion of state *judicial* remedies is not a prerequisite to the invocation of federal relief under section 1983 since the cause of action established by that statute is fully supplementary to any remedy, adequate or inadequate, that might exist under state law. As we stated the matter in *Moreno:*

> "The necessary effect of § 1983 is to make federal courts accessible for the protection of federal personal rights. Without it, one would find it difficult to explain to the Mexican-American plaintiff in this case that rights which come to him in the Bill of Rights and

the Fourteenth Amendment cannot, in the first instance, be protected in the federal courts. It is beside the point to say that federal question jurisdiction did not exist until 1875, or that state courts are as competent as federal courts to construe the constitution and to give appropriate relief. Congress, in unqualified terms, has provided a federal forum for civil wrongs of constitutional dimensions and for violations of specific civil rights laws." 431 F.2d at 1305 (footnotes omitted). Similarly, in McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622, the Supreme Court, extending the rationale of *Monroe*, held that a federal plaintiff also need not exhaust state *administrative* remedies prior to asserting a federal claim under section 1983. *Accord*, Houghton v. Shafer, 1968, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319; Damico v. California, 1967, 389 U.S. 416, 88 S.Ct. 526, 19 L. Ed.2d 647. *See generally* Note, Exhaustion of State Remedies Under the Civil Rights Act, 68 Colum.L.Rev. 1201 (1968).

It is therefore clear that where civil rights are asserted, exhaustion of state remedies has not been held to be a prerequisite to the maintenance of a federal cause of action under section 1983. *A fortiori*, where the civil rights complaint is framed in terms of facial unconstitutionality, courts have held exhaustion inapplicable since accelerated relief is the essence of the action. *E. g.*, Moreno v. Henckel, *supra; cf.* Wolff v. Selective Service Local Bd. No. 16, 2 Cir. 1967, 372 F.2d 817.

### 2. *Abstention*

Even though it has been held, as a jurisdictional matter, that a federal section 1983 complainant need not exhaust his state remedies, the doctrine of abstention might still permit a court, in its

---

Cf. Ex parte Young, supra, 209 U.S. [123] at 147–148, 28 S.Ct. [441] at 448–449, 52 L.Ed. [714] at 723, 724." 380 U.S. at 486, 85 S.Ct. at 1121.

11. At least one district court has adopted this view. Schwartz v. Galveston Inde-

pendent School District, S.D.Tex.1970, 309 F.Supp. 1034. As noted *infra*, however, this position has been explicitly repudiated by this court. See also Chevigny, Section 1983 Jurisdiction: A Reply, 83 Harv.L.Rev. 1352 (1970).

equitable discretion, to remit the plaintiff to the state courts. Abstention allows a federal court whose jurisdiction has been properly invoked to postpone decision, pending trial in a state court, when the federal result might turn on issues of state law. The doctrine, which had its genesis in an opinion by Mr. Justice Frankfurter in 1941, Railroad Comm. v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, was developed to minimize federal-state friction and to avoid unnecessary decisions of constitutional issues. *See generally* C. Wright, Law of Federal Courts § 52, at 196–208 (1970); Note, Federal Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L. Rev. 604 (1967). However, every constitutional right under every circumstance is not to be put on ice awaiting the hearing of the anvils of state adjudication. Since the doctrine has the effect of frustrating a federal litigant in his choice of an otherwise appropriately invoked federal forum, it has been applied only in narrowly limited "special circumstances." Propper v. Clark, 1949, 337 U.S. 472, 492, 69 S.Ct. 1333, 93 L.Ed. 1480; Zwickler v. Koota, *supra,* 389 U.S. at 248, 88 S.Ct. 391 and cases cited in n. 10. Generally, then, federal courts have abstained only where applicable state law which would be dispositive of the controversy was unclear and where a state court interpretation of the state law question might obviate the necessity of deciding the federal constitutional issue. *See generally* Reetz v. Bozanich, 1970, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed. 2d 68; Harman v. Forssenius, 1965, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50, Berrera v. Wheeler, 8 Cir. 1971, 441 F. 2d 795; Hall v. Garson, *supra,* 430 F.2d at 437.

Courts have long recognized that abstention is particularly inappropriate in an overbreadth or vagueness case grounded upon the First Amendment. *See, e. g.,* Dombrowski v. Pfister, *supra,* 380 U.S. at 492, 85 S.Ct. at 1124 ("abstention is at war with the purposes of the vagueness doctrine"). While, in contrast to the exhaustion principle, abstention merely postpones access to federal courts, the doctrine does contemplate considerable delay. Even outside the overbreadth area the Court in *McNeese* held that abstention, like exhaustion, was antithetical to the supplementary remedy purposes of the Civil Rights Act:

"We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court." 373 U.S. at 672, 83 S.Ct. at 1436.

*Accord,* Harman v. Forssenius, *supra,* 380 U.S. at 537, 85 S.Ct. 1177. Delay, of course, is even more intolerable in an overbreadth case since the postponement of relief itself might "effect the impermissible chilling of the very constitutional right * * * [the claimant] seeks to protect." Zwickler v. Koota, *supra,* 389 U.S. at 252, 88 S.Ct. at 397. *See also* Dombrowski v. Pfister, *supra*; Moreno v. Henckel, *supra,* 431 F.2d at 1308. While patience can sometimes be a jurisprudential virtue, courts have recognized that it must not be a frustrator or nullifier of First Amendment rights. In Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377, the Court was asked to abstain from adjudicating the facial validity of a Washington statute requiring the taking of loyalty oaths by state employees. Mr. Justice White, disposing of the abstention argument, wrote:

"It is fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the oath within the bounds of permissible constitutional certainty. Abstention does not require this.

Other considerations also militate against abstention here.

* * * * * *

Abstention operates to require piecemeal adjudication in many courts * * thereby delaying ultimate adjudication on the merits for an undue length of time * * * a result quite costly

where the vagueness of a state statute may inhibit the exercise of First Amendment freedoms * * * Meanwhile, where the vagueness of the statute deters constitutionally protected conduct, 'the free dissemination of ideas may be the loser.'" 377 U.S. at 378–379, 84 S.Ct. at 1326 (footnote omitted).

*Accord,* Keyishian v. Board of Regents, 1967, 385 U.S. 589, 601 n. 9, 87 S.Ct. 675, 17 L.Ed.2d 629.

Cases such as *Baggett* and *Zwickler* reflect the fact that in a facial attack the "special circumstances" which have been held to justify abstention not only are "at war" with the overbreadth doctrine but also are usually absent. Abstention, a product of the requirements of ripeness and standing, might be quite appropriate in the normal case to assure that the challenged state statute will actually be interpreted to reach the activities of the persons attacking its validity. But in an overbreadth case, where particular applications of a statute are not determinative and where conceptions of standing and ripeness are modified, such assurances are largely irrelevant. *See* Note, Federal Question Abstention, at 612–13. Moreover, even if it be assumed that a state court could resolve the overbreadth problems, either by means of "an acceptable limiting construction readily to be anticipated" or by voiding the statute on its face, abstention is nevertheless inappropriate. In such a situation the state courts would simply be deciding a federal constitutional issue within the framework of construing state law. A primary motive for abstaining— avoidance of constitutional issues—is not served. The issue is simply referred to another forum. The state courts, however, possess no special institutional competence to decide such issues. Since the federal courts are at least as adequate a forum, no real purpose would be served by denying a litigant his choice of a federal forum.

### 3. Comity Restraints on Interference with State Court Proceedings

Since the inception of our republic it has been held that federal courts, in the exercise of their jurisdiction, should give consideration to the sovereign status of the individual state. Subsumed under the phrase "comity," this notion embodies, in the words of Mr. Justice Black, a recognition "that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger v. Harris, supra. See also* Maraist, Federal Injunctive Relief Against State Court Proceedings: The Significance of Dombrowski, 48 Tex.L.Rev. 535, 541–43 (1970). Such considerations have prompted Congress, since the beginnings of the federal government, to provide that federal courts should not enjoin pending state judicial proceedings except in narrowly limited situations.[12] Concomitant with this congressional provision, and often indistinguishable from it,[13] courts have developed on their own

12. Thus, the anti-injunction act, first adopted in 1793, and now codified at 28 U.S. C.A. § 2283, provides in its present form: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

13. For example, in Sheridan v. Garrison, 5 Cir., 415 F.2d 699, cert. denied, 1770, 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed. 2d 685, and Machesky v. Bizzell, 5 Cir.

1969, 414 F.2d 283, we held that section 2283 simply codified a policy of judicial comity. However, in Atlantic Coast Line RR. v. Brotherhood of Locomotive Engineers, 1970, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234, the Supreme Court held that the Act did more than simply codify a comity theory which could yield to judicially-created exceptions:

"* * * A federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected

equitable notions of restraint in the exercise of jurisdiction which might interfere with state proceedings. *Maraist, supra,* at 541. This notion of comity restraint is impressively reinforced when joined by the ancient maxim that equity is reluctant to enjoin criminal prosecutions. *See* H. Hart & H. Weschsler, The Federal Courts and the Federal System 862 (1953); C. Wright, *supra,* § 52, at 206. Thus, in the long line of cases, including Fenner v. Boykin, 1926, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Spielman Motor Sales Co. v. Dodge, 1935, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; Beal v. Missouri Pacific R. R., 1941, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577, and Watson v. Buck, 1941, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416, the Supreme Court has held that federal injunctive relief against pending state court criminal proceedings was appropriate only in "extraordinary circumstances." Perhaps the clearest expression of that view is to be found in Douglas v. City of Jeannette, 1943, 319 U.S. 157, 163–164, 63 S.Ct. 877, 87 L.Ed. 1324, where Chief Justice Stone, speaking for the majority, stated that

> "[i]t is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of

the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.'" 319 U.S. at 157, 163–164, 63 S.Ct. at 881.

*See also* Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138.

Contrary to the doctrine of abstention, which has been held to apply only in "special circumstances," the policies of comity, particularly with regard to state criminal proceedings, have posed a strong counterweight to the overbreadth doctrine's emphasis upon accelerated review. Nevertheless, after *Dombrowski,* many commentators felt that the "chilling effect" rationale constituted one of those "extraordinary" or "special circumstances," Cameron v. Johnson, *supra,* 390 U.S. at 617–620, 88 S.Ct. 1335, 20 L.Ed.2d 182, which justified federal injunctive relief against state criminal proceedings.[14]

---

federal right or invade an area preempted by federal law, even when the interference is unmistakably clear. * * * This conclusion is required because Congress itself set forth the only exceptions to the statute, and those exceptions do not include this situation." 398 U.S. at 294–295, 90 S.Ct. at 1747. See generally Reaves & Golden, The Federal Anti-Injunctive Statute in the Aftermath of Atlantic Coast Line Railroad, 5 Ga.L.Rev. 294 (1971).

14. Even though many courts felt that, despite the restraints of comity, injunctive relief was appropriate in an overbreadth case, the anti-injunction act continued to pose an obstacle to federal intervention. Some courts overcame this hurdle by holding that § 1983 was an exception to the terms of § 2283 "expressly authorized by Act of Congress." E. g., Honey v. Goodman, 6 Cir. 1970, 432 F. 2d 333. For such courts, injunctive relief against pending state prosecutions was appropriate. Other courts circumnavigated § 2283's proscriptions by finding either that injunctive relief against future prosecutions was proper or that declaratory relief was available. See generally Note, The Federal Anti-Injunction Statute and Declaratory Judgments in Constitutional Adjudication, 83 Harv.L. Rev. 1870 (1970). Despite the Younger v. Harris sextet, the issues raised by these decisions as to the scope and applicability

*E. g.*, C. Wright, *supra*, at 182, 206–08; Maraist, *supra*, at 566, 579. The above, then, was the state of the law when the Supreme Court rendered its decisions in *Younger* and *Askew*. It is to those cases that we now turn.

### C. *The Significance of Younger and Askew*

In Younger v. Harris, *supra*, four residents of California challenged the state's Criminal Syndicalism Act in a three-judge federal district court. The district court held that the statute was void for vagueness and overbreadth and, *inter alia*, enjoined the district attorney from prosecuting a criminal action pending against Harris. The Supreme Court reversed, holding that the district court's action violated basic precepts of "Federalism." Stressing "the fundamental policy against federal interference with state criminal prosecutions," 401 U.S. at 46, 91 S.Ct. 746, at 751, 27 L.Ed.2d at 676, emphasized by such cases as Douglas v. City of Jeannette, Mr. Justice Black for a majority of the Court held that a federal district court may not enjoin a pending state prosecution unless the plaintiff can prove the existence of "irreparable injury" that is "both great and immediate." *Id.* This test of "irreparable injury," of course, is the one first articulated in Fenner v. Boykin, *supra*, and reiterated many times since. Of particular significance is not *Younger's* verbal formula for federal intervention, but its holding that, despite intimations to the contrary in *Dombrowski*, where state criminal proceedings are pending the necessary "irreparable injury" is not established by the mere fact that a statute may be facially overbroad or vague. Rather, the Younger majority held that to halt a pending state prosecution the plaintiff must show in addition "bad faith, harassment, or any other unusual circumstance that would call for equitable relief." *Id.* at 54, 91 S.Ct.

746, at 755, 27 L.Ed.2d at 679–681. Finally, in Samuels v. Mackell, *supra*, a companion case, the court held that where a state prosecution is pending "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment." Accordingly, where an injunction would be impermissible, "declaratory relief should ordinarily be denied as well." 401 U.S. at 73, 91 S.Ct. 764, at 768, 27 L.Ed.2d at 693–694.

*Younger* and its accompanying opinions, while significant, do not represent startling new doctrines with respect to the proper role of a federal court in our system of federalism. Rather, the decisions represent a judicial clarification of the significance of *Dombrowski* in light of prior jurisprudence. As Mr. Justice Black concluded in his opinion in *Younger:*

"For these reasons, fundamental not only to our federal system but also to the basic functions of the Judicial Branch of the National Government under our Constitution, we hold that the Dombrowski decision should not be regarded as having upset the settled doctrines that have always confined very narrowly the availability of injunctive relief against state criminal prosecutions." 401 U.S. at 53, 91 S. Ct. at 755.

The *Younger* decision, therefore, can be seen as a recognition of strong countervailing policies to the overbreadth theory represented by comity notions of deference to pending state criminal prosecutions. The opinion does not purport to extend beyond this traditional realm of comity and require across-the-board abdication of federal decisionmaking power in all manner of cases. Indeed, it is not clear how far the opinion even reaches within the confines of the comity sphere.[15] For example, *Younger's*

---

of § 2283 remain unresolved. See Le-Flore v. Robinson, 446 F.2d 715 (Goldberg, J., concurring).

15. In fact, as has been noted elsewhere, the real significance of *Younger* and its companions may lie in the questions they

emphasis on state criminal proceedings, concededly at the heart of comity policies, leaves open the question of its applicability to federal interference with pending state proceedings in the non-criminal area. In the words of Mr. Justice Stewart in his concurring opinion in *Younger*, joined by Mr. Justice Harlan (401 U.S. at 55, 91 S.Ct. at 757):

> " * * * [S]ince all these cases [*Younger* and its companions] involve state criminal prosecutions, we do not deal with the considerations which should govern a federal court when it is asked to intervene in state civil proceedings, where, for various reasons, the balance might be struck differently.[2]

2. Courts of equity have traditionally shown greater reluctance to intervene in criminal prosecutions than in civil cases. See Younger v. Harris, 401 U.S., at 43–44, 91 S.Ct., at 750 [27 L. Ed.2d at 669]; Douglas v. City of Jeannette, 319 U.S. 157, 163–164, 63 S.Ct. 877, 87 L.Ed. 1324 [1329]. The offense to state interests is likely to be less in a civil proceeding. A State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law. By contrast, the State might not even be a party in a proceeding under a civil statute. Cf. Law Students Civil Rights Research Council v. Wadmond, 401 U. S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749; Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515; Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442.

> "These considerations would not, to be sure, support any distinction between civil and criminal proceedings should the ban of 28 U.S.C. § 2283, which makes no such distinction, be held ·unaffected by 42 U.S.C. § 1983."

In the instant case, we are not even faced with the force and applicability of the anti-injunction act. The present

challenge to the Macon ordinance and charter provisions not only is outside the criminal sphere but also poses no possibility of interference with pending state proceedings. Rather, the present challenge simply requests relief against allegedly unconstitutional state action in the form of conditioning employment upon the surrender of political activity. It was just this type of situation that Mr. Justice Black distinguished from *Younger* in a footnote to his opinion in that case:

> "In Baggett [Baggett v. Bullitt, supra] we enjoined state officials from discharging employees who failed to take certain loyalty oaths. We held that the States were without power to exact the promises involved, with their vague and uncertain content concerning advocacy and political association, as a condition of employment. Apart from the fact that any plaintiff discharged for exercising his constitutional right to refuse to take the oath would have had no adequate remedy at law, the relief sought was of course the kind that raises no special problem— an injunction against allegedly unconstitutional state action (discharging the employees) that is not part of a criminal prosecution." 401 U.S. at 47 n. 4, 91 S.Ct. at 752.

To hold that *Younger* erects a general barrier to federal relief in a situation such as presented in the instant case would be to ignore the rationale of the opinion and to reject a long history of accepted jurisprudence. We simply do not think that *Younger* intended to proscribe completely the federal judicial role in the vindication of federal rights. To apply that decision outside its intended sphere—the well-established doctrine of comity restraints against federal in-

left unanswered. See Younger v. Harris, supra, 401 U.S. at 54, 91 S.Ct. at 756 (Stewart & Harlan, concurring); Le-Flore v. Robinson, 5 Cir. 1971, 446 F.2d 715 (Goldberg, J., concurring). For example, the decisions do not answer the question of the proper response of a federal district court when asked to grant

federal relief against a *threatened*, as opposed to a *pending*, state prosecution. Similarly, the decision made no attempt to resolve the ongoing controversy concerning the applicability of the federal anti-injunction act to a suit brought under section 1983. 401 U.S. at 55, 91 S.Ct. 746. See also note 14 *supra*.

terference with pending state criminal proceedings—would be in direct contradiction to the purposes of the Civil Rights Act as articulated by the Supreme Court in such decisions as Monroe v. Pape, *supra*, Zwickler v. Koota, *supra*, and by our court in Moreno v. Henckel, *supra*. *See also* Perez v. Ledesma, *supra*, 401 U.S. 82, 91 S.Ct. 674 (Brennan, White, and Marshall concurring in part and dissenting in part). We do not think that the Court in *Younger* intended to repeal judicially by rendering impotent a large portion of the remedial promise of that Act. We therefore hold that at least outside the comity sphere we are simply to continue to apply those traditional notions of restraint reflected in the doctrines of exhaustion and abstention.

Nor do we think that the recent decision in Askew v. Hargrave, *supra*, vitiates this conclusion or implies a broad extension of the *Younger* principles. In *Askew* a three-judge federal court was asked to declare unconstitutional under the equal protection clause a Florida public education financing scheme whereby property-poor counties received less money than property-rich counties. In declaring the scheme unconstitutional, the district court rejected the defendants' argument that it "should abstain from considering the case in deference to state court proceeding[s]" which had been filed subsequent to the filing of the federal suit and which challenged the Florida financing scheme on state law grounds. Relying on *Monroe* and *McNeese*, the district court held that "[t]he fact that a state remedy is available is not a valid basis for federal court abstention." Hargrave v. Kirk, D.C., 313 F.Supp. 944, at 946–947. The Supreme Court vacated this judgment and remanded to the district court with the following comments:

> "The reliance upon Monroe v. Pape and McNeese was misplaced. Monroe v. Pape is not in point for there 'the state remedy, though adequate in theory, was not available in practice.' 365 U.S. at 174, 81 S.Ct. 473, 5 L.Ed.2d at 498. McNeese held that 'assertion of

a federal claim in a federal court [need not] await an attempt to vindicate *the same claim* in a state court.' 373 U.S., at 672, 83 S.Ct. 1433, 10 L. Ed.2d at 625 (emphasis added). See also Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Our understanding from the colloquy on oral argument with counsel for the parties is that the Christian case asserts, not the 'same claim,' that is, the federal claim of alleged denial of the federal right of equal protection, but primarily state law claims under the Florida Constitution, which claims, if sustained, will obviate the necessity of determining the Fourteenth Amendment question. In such case, the line of decisions of which Reetz v. Bozanich, 397 U.S. 82, 90 S. Ct. 788, 25 L.Ed.2d 68 (1970), is a recent example, states the principles which should inform the exercise of the District Court's discretion as to whether to abstain." 401 U.S. at 478, 91 S.Ct. at 858.

It is true that *Askew* implies some limitation of the expansive language in *McNeese* and *Harman* which might have been construed to obviate the need for abstention in all civil rights cases. *See* Note, Federal-Question Abstention, *supra*, at 607–11; Comment, Exhaustion of State Remedies, *supra*, at 1204. However, the opinion does not proclaim to reverse the settled view (1) that exhaustion of state remedies is not required in an action under § 1983, or (2) that abstention, even if applicable in a § 1983 suit, is only to be applied in narrow, "special circumstances." It is simply an application of traditional abstention principles to the civil rights area, a holding clearly presaged by Reetz v. Bozanich, 1970, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68, upon which *Askew* heavily relies. The limited nature of the per curiam holding in *Askew* is underlined by examination of the decision in *Reetz*. That case involved an application by nonresidents of Alaska for a commercial salmon net gear license in that state. Invoking the equal protection clause,

plaintiffs challenged the constitutionality of an Alaska statute, and regulations enacted pursuant thereto, which limited commercial salmon fishing licenses to defined groups of persons. It was also alleged that the statute and regulations in question deprived them of their rights under the Alaska Constitution, the relevant provisions of which had never been interpreted by an Alaskan court. The Supreme Court held that abstention should have been ordered since the state law questions which could obviate the federal constitutional issue were "delicate ones, the resolution of which is not without substantial difficulty—certainly for a federal court." 397 U.S. at 84, 90 S.Ct. at 789, quoting City of Meridian v. Southern Bell Tel. & Tel. Co., 1959, 358 U.S. 639, 640–641, 79 S.Ct. 455, 3 L.Ed.2d 562. Equally important, however, is the cautionary language which accompanied this holding and which the Court in *Askew*, by relying on *Reetz*, adopted by implication.

"It is, of course, true that abstention is not necessary whenever a federal court is faced with a question of local law, the classic case being Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9, where federal jurisdiction was based on diversity only. Abstention certainly involves duplication of effort and expense and an attendant delay. See England v. Louisiana State Board, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440. That is why we have said that this judicially created rule which stems from Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, should be applied only where 'the issue of state law is uncertain.' Harman v. Forssenius, 380 U.S. 528, 534, 85 S. Ct. 1177, 14 L.Ed.2d 50, 55. Moreover, we said in Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444, 450, that abstention was applicable 'only in narrowly limited "special circumstances,"' citing Propper v. Clark, 337 U.S. 472, 492, 69 S. Ct. 1333, 93 L.Ed. 1480, 1496. In Zwickler, a state statute was attacked on the ground that on its face it was repugnant to the First Amendment; and it was conceded that state court construction could not render unnecessary a decision of the First Amendment question. 389 U.S., at 250, 88 S.Ct. 391, 19 L.Ed.2d at 451. A state court decision here, however, could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship." 397 U.S. at 86, 90 S.Ct. at 790.

Reinforcing this interpretation of *Askew* is the Court's decision in Wisconsin v. Constantineau, 1971, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515, rendered in the same term as *Askew* and *Younger*. In *Constantineau* the Court held that an anticipatory facial attack in federal court upon a Wisconsin ordinance which provided disabilities for persons designated by certain municipal authorities as "excessive drinkers" was proper. The Court, in refusing to abstain, stated:

"It is suggested that the three-judge court should have stayed its hand while the aggrieved person repaired to the state courts to obtain a construction of the Act or relief from it. The fact that Wisconsin does not raise the point does not of course mean that it lacks merit. Yet the suggestion is not in keeping with the precedents.

"Congress could of course have routed all federal constitutional questions through the state court systems, saving to this Court the final say when it came to review of the state court judgments. But our First Congress[3] resolved differently and created the federal court system and in time granted the federal courts various heads of jurisdiction,[4] which today involve most federal constitutional rights. Once that jurisdiction was granted, the federal courts resolved those questions even when they were enmeshed with state law questions. In 1941 we gave vigor to the so-called abstention doctrine in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643, 85 L.Ed. 971. In that case an

authoritative resolution of a knotty state law question might end the litigation and not give rise to any federal constitutional claim. Id., at 501, 61 S.Ct. 643, 85 L.Ed. at 975. We, therefore, directed the District Court to retain the suit pending a determination by a state court of the underlying state law question. We applied the abstention doctrine most recently in Fornaris v. Ridge Tool, 400 U.S. 41, 44, 91 S.Ct. 156, 27 L.Ed.2d 174, where a relatively new Puerto Rican statute, which had not been authoritatively construed by the Commonwealth's courts, 'might be judicially confined to a more narrow ambit which would avoid all constitutional questions.' We ordered the federal courts to stay their hands until the Puerto Rican courts had spoken. Speaking of Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68, we noted that the 'three-judge federal court should not have proceeded to strike down an Alaska law which, if construed by the Alaska Supreme Court, might be so confined as not to have any constitutional infirmity.' Id., at 43, 91 S.Ct. 157, 27 L.Ed.2d at 178. But the abstention rule only applies where 'the issue of state law is uncertain.' Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50, 55. Thus our abstention cases have dealt with unresolved questions of state law which only a state tribunal could authoritatively construe. Reetz v. Bozanich, supra; City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562.

In the present case the Wisconsin Act does not contain any provision whatsoever for notice and hearing. There is no ambiguity in the state statute. There are no provisions which could fairly be taken to mean that notice and hearing might be given under some circumstances or under some construction but not under others. The Act on its face gives the chief of police the power to do what he did to the appellee. Hence the naked question, uncomplicated by an unresolved state law, is whether that Act on its face is unconstitutional. As we said in Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444, 451, abstention should not be ordered merely to await an attempt to vindicate the claim in a state court. Where there is no ambiguity in the state statute, the federal court should not abstain but proceed to decide the federal constitutional claim. Id., at 250–251, 88 S.Ct. 391, 19 L.Ed.2d at 451. We would negate the history of the enlargement of the jurisdiction of the federal district courts,[5] if we held the federal court should stay its hand and not decide the question before the state courts decided it." 400 U.S. 437, 91 S.Ct. 510 (footnotes omitted).

It is therefore clear that *Askew* does not constitute a broadside ban upon federal relief where state interests are involved. Instead, it simply represents an application of traditional abstention principles to one facet of the civil rights area. Taken in conjunction with *Younger*, it is evident that, outside the area governed by comity restraints against federal interference, federal relief is appropriate except in those narrow "special circumstances" which would justify abstention. In the instant case the comity principles of restraint which engendered *Younger* are clearly inapplicable. The relief requested by plaintiffs poses no threat to an on-going state proceeding, either criminal or noncriminal. Nor do we think that abstention is appropriate. Abstention, after all, should not be synonymic with nullification of constitutional rights. But to tolerate application of the doctrine in this overbreadth and vagueness case would be, as we have shown above, to perpetuate the very evils of which the plaintiffs complain. Moreover, referral to state nisi prius would represent neither a saving of judicial resources nor an obviation of the federal constitutional questions presented. We therefore hold that the district court below was correct in considering the merits of plaintiffs' constitutional challenge to the Macon legislative scheme.

### III.

Having determined that we must examine the Macon charter and ordinance

provisions on their face for constitutional soundness, we note that plaintiffs primarily contend that the Macon provisions, by virtue of their overbreadth and vagueness, sweep too broadly into the areas of protected First Amendment expression. The plaintiffs argue that proscribing city firemen from "contributing any money to any candidate, soliciting votes, or prominently identifying themselves in a political race with or against any candidate for office" not only leaves them at sea as to what political activity they may engage in but is too tenuously connected with a valid state interest to merit constitutional approval. Defendants, on the other hand, assert that these provisions do not deprive the affected Macon employees of any fundamental constitutional rights and are rationally related to a significant state interest. In the words of the defendants:

> "Rather than being enacted to deprive city firemen and policemen of any of their rights, said charter and ordinance provisions were adopted for the purposes of protecting these employees from political pressure and harassment from public office holders and from aspirants to public office and to protect the public from the evil which would result should city firemen and policemen be organized and function as political activists or pressure groups. Enforcement of these provisions has had and will continue to have the beneficial effects intended."

The district court agreed with the defendants. Stating that "[i]t can hardly be doubted that the aims of this type legislation prohibiting political activity on the part of governmental employees is a worthy aim" and "that there is a substantial public interest of the state and municipality requiring protection," the court upheld the constitutionality of the charter and ordinance provisions against all attack.

■ It is true that the government may have a greater interest in regulating the political activities of its employees than it would have in regulating the political activities of the citizenry in general. For example, the government, as employer, has a legitimate interest in prohibiting public officials from using their authority to coerce their inferior employees into contributing to their campaigns. *See* Ex Parte Curtis, 1882, 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232 (sustaining federal statute prohibiting "all executive officers or employés of the United States not appointed by the President, with the advice and consent of the Senate," from "requesting, giving to, or receiving from" other government employees political contributions). Similarly, the government should be able to regulate activities which directly interfere with the proper performance of its employees' duties. However, since political speech has been referred to as "the essence of sef-government," Garrison v. Louisiana, 1964, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125, restrictions upon it should not lightly be imposed. The public should generally be able to speak on public issues free from fear of resulting criminal or civil penalties. *See also* Bond v. Floyd, 1966, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235; Mills v. Alabama, 1966, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484; New York Times v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv.L.Rev. 1 (1965). *New York Times* and related cases, of course, did not determine the precise extent to which the political expression and activities of public employees may be curtailed, but those cases do stand for the proposition that absent exceptional circumstances [16] "debate on public issues should be uninhibited, robust, and wide-open * * *." New York Times v. Sullivan, *supra,* 376 U.S. at 270, 84 S.Ct. at 721. Since

---

16. A showing of actual malice was held to be a sufficiently exceptional circumstance to justify a libel judgment in *New York Times.*

public employees make up an ever-increasing portion of the work force, a blanket prohibition upon political activity, not precisely confined to remedy specific evils, would deal a serious blow to the effective functioning of our democracy. In this area, the overbreadth doctrine plays an important role, for it requires the legislature to focus narrowly on the particular evils it wishes to combat when speech is at stake. *See* Shelton v. Tucker, *supra*.

 With these principles in mind it seems patently obvious to us that the Macon charter and ordinance provisions sweep too broadly and proscribe a great deal of political activity which is unrelated to the effective workings of the fire department. It condemns political contributions of money and support by firemen in all campaigns, federal, state, and local. It prohibits speech, outside of working hours, which "prominently identifies" the firemen with any candidate for any public office. Under the Macon regulatory scheme firemen are effectively rendered political eunuchs. The very fact that the scheme has been construed to forbid political bumper stickers —a particularly innocuous form of political activity—points out clearly the broadside nature of the Macon prohibitory regulations. We might ask whether a fireman's bumper stickers are so politically inflammatory that they would inhibit his firefighting ferocity or does the proscription of bumper stickers prevent extortion of political contributions? We think not. Macon has simply not aimed precisely at particular, specific evils which might justify political regulation. Bland assurances that the Macon scheme contributes to the "reasonable neutrality" of public employees or constitutes a "worthy aim" do nothing to overcome the fatal overbreadth of the charter and ordinance provisions in question.

Moreover, the Macon legislative provisions suffer from unconstitutional vagueness. If bumper stickers be assumed to "prominently identify" a fireman with a political candidate, where

does the regulation stop? May a fireman discuss political candidates with his friends? May he register his support of a candidate through a letter to his newspaper? Or is he relegated to expressing his political views only in the secrecy of the voting booth? It is simply inconceivable to us that one acting in good faith under this regulatory scheme would readily know what conduct was prohibited and what conduct was permitted. Because of the vagueness of these legislative provisions it is likely that most firemen would steer clear of political expression, even if protected under the First Amendment, rather than risk suspension or dismissal. But it is just this vice which makes continued toleration of the charter and ordinance prohibitions insupportable.

Defendants, however, argue that the Supreme Court's decision in United Public Workers v. Mitchell, 1947, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754, controls this case and requires that the Macon charter and ordinance provisions be upheld. In *Mitchell* the Court in a 4–3 opinion upheld the constitutionality of the Hatch Act of 1939, 5 U.S.C.A. § 7324 (a) (2), which prohibits all officers and employees of the federal government, with the exception of a few top-level officers, from taking "any active part in political management or in political campaigns." *See also* Kearney v. Macy, 9 Cir. 1969, 409 F.2d 847, cert. denied, 397 U.S. 943, 90 S.Ct. 958, 25 L.Ed.2d 124; Wisconsin State Employees Ass'n v. Wisconsin Nat'l Resources Bd., W.D. Wis. 1969, 298 F.Supp. 339 (3-judge court).

We do not think that *Mitchell* is controlling in the present case, however, for the Macon scheme goes far beyond the Hatch Act provisions approved there by the Supreme Court. As stated by Mr. Justice Reed in *Mitchell*:

"[The petitioner's] stated offense is taking an 'active part in political management or in political campaigns.' He was a ward executive committeeman of a political party and was politically active on election day as a

472

worker at the polls and a paymaster for the services of other party workers. The issue for decision and the only one we decide is whether such a breach of the Hatch Act and Rule 1 of the Commission can, without violating the Constitution, be made the basis for disciplinary action." 330 U.S. at 94, 67 S.Ct. at 566.

Of particular relevance are Justice Reed's following comments for the plurality:

"A reading of the Act and Rule 1, notes 2 and 6, supra, together with the Commission's determination shows the wide range of public activities with which there is no interference by the legislation. It is only partisan political activity that is interdicted. It is active participation in political management and political campaigns. Expressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted by law so long as the Government employee does not direct his activities toward party success." 330 U.S. at 100, 67 S.Ct. at 570.

See also Wilson v. United States Civil Serv. Comm'n, D.D.C.1955, 136 F.Supp. 104.

By proscribing all forms of political activity, the Macon scheme goes far beyond the provisions of the Hatch Act upheld in Mitchell. Displaying a bumper sticker is a far cry from actively participating in organized political affairs. It is more akin to a personal expression of political opinion, left untouched by Mitchell, than to partisan concerted activity on behalf of a party. See Wilson v. United States Civil Serv. Comm'n, supra.

However, it cannot be denied that Mitchell, even if it does not directly rule the instant case, enunciates views as to the scope of independent judicial review of legislative restrictions on the political expressions of public employees which may be of controlling significance. In essence, Justice Reed employed a "rational nexus" test to uphold the Hatch Act:

"For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service."

This standard of review, with its almost wholesale deference to the legislature's judgment, would make strict overbreadth scrutiny of the Macon scheme impossible. Mitchell, in other words, held that a broad prophylactic rule against political activity—which, in the individual case, might proscribe conduct unrelated to a significant state interest—could be upheld so long as the legislature's overall judgment was premised upon a rational basis. It is this approach in Mitchell which we think is no longer good law. It is certainly inconsistent with other First Amendment cases, dating back as early as 1940, which have held that

"[a] statute touching those protected rights [First Amendment free speech] must be 'narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State.'" Elfbrandt v. Russell, 1966, 384 U.S. 11, 18, 86 S.Ct. 1238, 16 L.Ed.2d 321, quoting Cantwell v. Connecticut, supra, 310 U.S. at 311, 60 S.Ct. 900, 84 L.Ed. 1213.

Because of this policy, the Supreme Court has repeatedly held that "[b]road prophylactic rules in the area of free expression are suspect. * * * Precision of regulation must be the touchstone in * * * area[s] so closely touching our most precious freedoms." NAACP v. Button, supra, 371 U.S. at 438, 83 S.Ct. at 340. Any vitality which might have remained in Mitchell's "rational basis" balancing test was clearly put to rest in United States v. Robel, supra, where the Court held facially invalid a statute which prohibited members of registered subversive organizations from working in public or private "defense facilities." The Court stated in an important footnote:

"It has been suggested that this case should be decided by 'balancing' the governmental interests expressed

in § 5(a) (1) (D) against the First Amendment rights asserted by the appellee. This we decline to do. We recognize that both interests are substantial, but we deem it inappropriate for this Court to label one as being more important or more substantial than the other. Our inquiry is more circumscribed. Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal. In making this determination we have found it necessary to measure the validity of the means adopted by Congress against both the goal it has sought to achieve and the specific prohibitions of the First Amendment. But we have in no way 'balanced' those respective interests. We have ruled only that the Constitution requires that the conflict between congressional power and individual rights be accommodated by legislation drawn more narrowly to avoid the conflict. There is, of course, nothing novel in that analysis. Such a course of adjudication was enunciated by Chief Justice Marshall when he declared: 'Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, *which are not prohibited, but consist with the letter and spirit of the constitution,* are constitutional.' M'Culloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579, 605 (1819) (emphasis added). In this case, the means chosen by Congress are contrary to the 'letter and spirit' of the First Amendment."

389 U.S. at 268 n. 20, 88 S.Ct. at 426.

This erosion of *Mitchell* has been clearly recognized, *e. g.,* National Ass'n of Letter Carriers v. Blount, D.D.C.1969, 305 F.Supp. 546, 549, appeal dismissed, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (3-judge court) ("[s]ubsequent case law

has weakened *Mitchell* as precedent in First Amendment cases."); De Stefano v. Wilson, 1967, 96 N.J.Super. 592, 233 A.2d 682; Bagley v. Washington Township Hospital Dist., 1966, 65 Cal.2d 499, 421 P.2d 409; Minielly v. State, 1966, 242 Or. 490, 411 P.2d 69; Kinnear v. City and County of San Francisco, 1964, 61 Cal.2d 341, 38 Cal.Rptr. 631, 392 P.2d 391; Fort v. Civil Serv. Comm'n, 1964, 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385; Bruff, Unconstitutional Conditions Upon Public Employment: New Departures in the Protection of First Amendment Rights, 21 Hastings L.J. 129 (1969); Note, Political Activity and the Public Employee: A Sufficient Cause for Dismissal? 64 Nw.U.L.Rev. 736 (1970); 38 Fordham L.Rev. 801 (1970); 42 N.Y.U.L.Rev. 750 (1957).

*Mitchell,* therefore, was out of harmony with other First Amendment cases at the time it was decided, and, as shown above, with a long line of cases decided subsequently. The decision, consequently, must have been based upon the special nature of public employment. Support for this view of *Mitchell* can be found in a footnote to Mr. Justice Reed's opinion, 330 U.S. at 99 n. 34, 67 S.Ct. at 569, where he approved a hoary epigram from the pen of Mr. Justice Holmes, then speaking for the Massachusetts Supreme Judicial Court:

"The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. New Bedford, 1892, 155 Mass. 216, 29 N.E. 517.

At the time *Mitchell* was decided this "privilege theory" may have had a good deal of judicial validity, *see, e. g.,* Garner v. Board of Public Works, 1951, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317; Adler v. Board of Educ., 1952, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517, but subsequent cases have thoroughly repudiated the concept. Beginning with Wieman v. Updegraff, 1952, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, and continuing in Slochower v. Board of Higher Education,

1956, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, Greene v. McElroy, 1958, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377, Speiser v. Randall, 1958, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460, Cramp v. Board of Public Instr., 1961, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285, and other cases, the Court rejected the curtailment of First Amendment rights under the guise of a "right-privilege distinction." *See generally* Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L.Rev. 1439 (1938). Finally, in the loyalty oath cases, such as Keyishian v. Board of Regents, *supra,* and Elfbrandt v. Russell, *supra,* the doctrine was completely laid to rest. In *Keyishian,* for example, the Court specifically rejected the notion that "public employment * * may be conditioned upon the surrender of constitutional rights which could not be abridged by direct government action. * * * " 385 U.S. at 60, 87 S.Ct. at 685, 17 L.Ed.2d 629. The case of Pickering v. Board of Educ., 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, is, perhaps, the clearest expression of the appropriate judicial response to claims of constitutional rights in the public employment sphere. There an Illinois school teacher was dismissed from his position by the Board of Education for sending, in connection with a recently proposed tax increase, a letter to a local newspaper that was critical of the way in which the Board had handled past proposals to raise new revenues for the schools. In holding that the teacher's dismissal was improper, the Court, through Mr. Justice Marshall, stated:

"To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. E. g., Wieman

v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). '[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents, supra, at 605–606, 87 S.Ct. 675, 17 L Ed 2d at 642." 391 U.S. at 568, 88 S.Ct. at 1734.

■ In light of *Pickering* and related cases we hold that the Macon scheme, despite the fact that it applies to public employees, must be tested by traditional overbreadth principles. As shown above, under those principles, whatever the continued vitality of the narrow Mitchell holding with regard to the constitutional validity of the Hatch Act, the Macon scheme is fatally overbroad and vague. In several recent state cases, it has been held that ordinances of the same breadth as that found in the instant case were facially unconstitutional. For example, in Fort v. Civil Serv. Comm'n, *supra,* the California Supreme Court sitting en banc considered a county charter provision prohibiting public employees from taking any part in a political campaign or election except to vote or privately express an opinion. The charter was found unconstitutionally overbroad because it encompassed both valid and invalid restrictions on free speech. Similarly, in De Stefano v. Wilson, *supra,* a New Jersey superior court struck down a statute that prohibited taking an active part in politics, while in City of Miami v. Sterbenz, Fla.1967, 203 So.2d 4, the Florida Supreme Court voided on its face an ordinance prohibiting public employees from taking "part * * * in political campaigns further than to cast * * * [their] vote[s] or express privately * * * [their] opinions." *See also* Minielly v. State, *supra;* Kinnear v. City and County of San Francisco, *supra* (statutes or ordinances void on face which proscribed public employee can-

didacies for public office); Bagley v. Washington Township Hospital Dist., *supra* (statute which provided that "[n]o officer or employee * * * shall take an active part in any campaign for or against any candidate, except himself, for an office of such local agency, or for or against any ballot measure relating to the recall of any elected official of the local agency" held void for overbreadth). The Macon lawmaking authorities, as in these related state cases, have likewise failed to focus narrowly upon a substantial state interest which might justify some proscription of the political activities of its firemen. Instead, Macon had adopted a far-reaching scheme that sweeps too broadly into the First Amendment area. But, as *Pickering* teaches us, where the political activities of a public employee are unrelated to the performance of his duties he is to be treated for purposes of adjudicating his First Amendment rights as a "member of the general public." 391 U.S. at 572–573, 88 S.Ct. 1731.[17] It is difficult for us to see how many of the political activities arguably proscribed under the Macon charter and ordinance provisions have any relation to the proper performance of its firemen's employment duties. Since expressive rights of the first magnitude are therefore unnecessarily curtailed, the Macon scheme cannot stand. We accordingly hold that Section 79, Rule 2, of the Macon City Charter, and Section 2–127 of the Macon municipal ordinances are facially unconstitutional.

Much of what we have said above also leads us to conclude in the alternative that the proscription of bumper stickers under the facts of this case constitute an unconstitutional application of the Macon regulatory scheme. There being no intimation of a compelling state interest for the blackout of a fireman's bumper sticker, the resulting infringement upon political activity is unjustified. We therefore hold that under the facts of this case there has also been an unconstitutional application of the Macon charter and ordinance provisions.

## IV.

Summarizing our conclusions, we have held that federal consideration of the instant case is proper and have declared that Section 79, Rule 2, of the Macon City Charter and Section 2–127 of the city's municipal ordinances are both facially unconstitutional and unconstitutional as applied to the conduct of plaintiffs and to the members of their class. Having held this much, plaintiffs ask us to go further and grant the following additional relief:

"3. Permanently enjoin defendants and their successors in office from enforcing or attempting to enforce, directly or indirectly, by any means or device whatsoever, Rule #2 of § 79 of the Macon City Charter and § 2–127 of the Code of Ordinances of the City of Macon, Georgia;

4. Direct the District Court to supervise a complete inspection of the personnel files and records affecting members of the Fire Department of the City of Macon, Georgia, to insure the nonexistence of any taint in these records resulting from alleged violations of the void ordinance or from the participation of plaintiffs in this litigation;

5. Require that, as a part of the purge of these records, a written explanation be made by the superior officer of any member of the fire department whose 'efficiency rating' has decreased since the previous rating period if that member was a plaintiff in this case, was active as an official of Local 634 of the International Association of Firefighters, or was one of those persons known to have engaged in 'political activity'; and

6. Grant such other and further relief as the Court deems just and prop-

---

17. The Court in *Pickering* therefore held that the *New York Times* test of actual malice was to be utilized to adjudge the validity of Pickering's dismissal for concededly erroneous statements made in his letter.

er in order fully to protect the rights of plaintiffs and the class which they represent."

In view of our holding, we think that the proper procedure to follow in the instant case is to remand the proceedings to the district court for the entry of a judgment consistent with our declaration and for such other relief as the court, in its equitable discretion, deems appropriate. Since the district court agreed in its opinion that if the charter and ordinance provisions were invalid, excision of any adverse comments in the plaintiffs' personnel files would be necessary, the court, on remand, will have an opportunity to carry out an inspection of the pertinent records. Similarly, the district court shall determine whether further relief, including injunctive relief, is both necessary and proper to effectuate the declaration rendered herein.

For the reasons given above, the judgment of the district court is reversed and the case is remanded to the district court for other proceedings pursuant to this opinion.

Reversed and remanded.