Isiah **HADNOTT** et al., Appellants,

v.

**Melvin R. LAIRD, individually and in his capacity as Secretary of Defense of the United States, et al.**

**No. 24596.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1971.

Decided Feb. 29, 1972.

As Amended March 7, 1972.

Rehearing Denied Sept. 12, 1972.

Mr. Richard B. Sobol, Washington, D. C., with whom Miss Elizabeth Molodovsky, and Messrs. Richard T. Seymour, Washington, D. C., George Cooper, and James M. Nabrit, III, New York City, were on the brief, for appellants.

Mr. Irwin Goldbloom, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and Alan S. Rosenthal, Atty., Department of Justice, were on the brief, for federal appellees.

Mr. Roberts B. Owen, Washington, D. C., with whom Messrs. John Vanderstar, and Jerome Ackerman, Washington, D. C., were on the brief, for appellees American Can Company and Scott Paper Company.

Before ROBB and WILKEY, Circuit Judges, and FRANK M. JOHNSON, Jr.* Chief Judge, U. S. District Court for the Middle District of Alabama.

WILKEY, Circuit Judge:

Plaintiffs appeal from an order of the District Court dismissing an action for injunctive and declaratory relief against the Secretary of Defense and the Administrator of the General Services Administration. Plaintiffs brought the action on their own behalf and "on behalf of all black employees, applicants for employment, and prospective applicants for employment at the southern facilities" of eleven paper product companies having supply contracts with Defense and GSA, alleging that the rights of plaintiffs (and the class they represent) had been violated under the due process clause of the Fifth Amendment by the failure of the Government to enforce the companies' contractual agreements for nondiscrimination. The action sought an injunction against the two government officials, preventing the award of any future contracts and requiring the termination of the existing ones until all alleged racially discriminatory employment practices should be eliminated. The District Court dismissed the action on two grounds, sovereign immunity and the failure of the plaintiffs to exhaust their administrative remedies. Without reaching the first, we affirm on the latter ground.

I.

The facts are stated fully in the published opinion [1] of the able trial judge. Executive Order 11246, last in the series of Presidential orders directed at eliminating discrimination, requires that every government contract include specific provisions binding the contractor not to discriminate against any employee or applicant because of race, color, creed, or national origin, and to take affirmative action to insure that nondiscrimination is a reality. The penalties for violating these contractual obligations include contract cancellation, termination, or suspension, and ineligibility for future government contracts.

The overall enforcement of these nondiscriminatory contract obligations is entrusted not to the specific contracting agencies themselves (although they have primary responsibility for obtaining compliance), but to the Secretary of Labor. Aside from the contracts with his own Department, he has no special interest in any particular contract or contractor, but independently has the specific duty to see that the nondiscriminatory provisions are enforced with all government contractors. To carry out his responsibility the Secretary has created the Office of Federal Contract Compliance and promulgated detailed regulations, which among other things, establish a complete procedure under which any employee or applicant for employment may complain of discriminatory

---

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1970).

1. 317 F.Supp. 379 (1970).

practices by a government contractor.[2] Following a complaint the regulations require prompt investigation to determine if there has been a violation of the equal opportunity clause. In accord with the usual common sense principle of avoiding litigation where possible, if investigation indicates a violation, the preferred solution is for the offending contractor to take immediate corrective steps. If the contractor disputes the existence of violations, he is given a hearing, at which time the complainants or witnesses offered by them may be heard.[3] If after hearing a violation is determined, the penalties authorized by the Executive Order may be imposed.[4]

At the time of oral argument, out of the eleven companies involved here, with three the Government had reached new affirmative action agreements correcting violations found by the investigation, compliance reviews had been conducted and were being analyzed to determine the existence of violation in four instances, and the remaining four companies were scheduled for compliance reviews in the near future.[5]

2. 41 C.F.R. § 60–1.21–.23.

3. 41 C.F.R. § 60–1.26(b) (1) (2) reads as follows:

(b) *Formal hearings*—(1) General *procedure.* The Director or the agency head, with the approval of the Director, may convene formal hearings pursuant to Subpart B of this part. Such hearings shall be conducted in accordance with procedures prescribed by the Director or the agency head. Reasonable notice of a hearing shall be sent by registered mail, return receipt requested, to the last known address of the prime contractor or subcontractor complained against. Such notice shall contain the time and place of hearings, a statement of the provisions of the order and regulations pursuant to which the hearing is to be held, and a concise statement of the matters pursuant to which the action furnishing the basis of the hearing has been taken or is proposed to be taken. Copies of such notice shall be held before a hearing officer designated by the Director or an agency head. Each party shall have the right to counsel, a fair opportunity to present evidence and argument and to cross-examine. Wherever a formal hearing is based in whole or in part on matters subject to the collective bargaining agreement and compliance may necessitate a revision of such agreement, any labor organization which is a signatory to the agreement shall have the right to participate as a party. Any other person or organization shall be permitted to participate upon a showing that such person or organization has an interest in the proceedings and may contribute materially to the proper disposition thereof. The hearing officer shall make his proposed findings and conclusions upon the basis of the record before him.

(2) *Cancellation, termination, and debarment.* No order for cancellation or termination of existing contracts or subcontracts or for debarment from further contracts or subcontracts pursuant to section 209 of the order shall be made without affording the prime contractor or subcontractor an opportunity for a hearing. . . .
41 C.F.R. § 60–2.2(c) (1) reads as follows:

(1) If the contractor fails to show good cause for his failure or fails to remedy that failure by developing and implementing an acceptable affirmative action program within 30 days, the compliance agency, upon the approval of the Director, shall issue a notice of proposed cancellation or termination of existing contracts or subcontracts and debarment from future contracts and subcontracts pursuant to § 60–1.26(b), giving the contractor 10 days to request a hearing. If a request for hearing has not been received within 10 days from such notice, such contractor will be declared ineligible for future contracts and current contracts will be terminated for default.

4. 41 C.F.R. § 60–1.24, 60–1.26, 60–1.27.

5. While the Senate Committee on Labor and Public Welfare stated, in its recommendations for the bill to improve the Equal Employment Opportunity Commission which the Senate passed on 2 October 1970, as noted by the plaintiffs,

. . . [T]he committee also believes that an adequate job of providing equal employment opportunity has not, and is not, being provided through the Federal procurement function. There has been far too much nonpublic discussion and negotiation and far too few understandable results. In many instances the [Labor] Depart-

## II.

Although administrative action under Executive Order 11246 has been and is taking place, yet nowhere in the record is it asserted that any specific one of the plaintiffs has filed a complaint against one of the named companies and invoked the procedure provided by Executive Order 11246 and the implementing regulations.[6] There is thus no showing by plaintiffs that they have asserted before and been denied rights by the OFCC. Instead, plaintiffs argue, first, that it would be fruitless for them to do so and, second, that because they are asserting constitutional rights they cannot be required to do so before resorting to the federal court.

### A.

As to the usefulness of plaintiffs resorting to the administrative procedure set up to achieve precisely the results which plaintiffs desire in this case, i. e., either strict compliance with equal employment opportunity requirements or the debarment of the offending companies from government contracts, we are

of the opinion that plaintiffs will never know the result until they try.[7] Plaintiffs have a variety of excuses as to why pursuing the prescribed administrative route instead of leaping into court with a constitutional claim would be a waste of their time.

1. Principally plaintiffs claim that in the instances where the investigation has been made and completed, and corrective action taken pursuant to a new, specific affirmative action agreement, the companies are still in violation. If this is true, there is nothing to preclude the plaintiffs from filing another complaint making such factual assertions as they think can be established, and calling for a hearing on such complaint in which the plaintiffs and witnesses offered by them may be allowed to participate.

2. Plaintiffs further assert that neither Executive Order 11246 nor the regulations provide an absolute right to the complainants or witnesses offered by them to participate in such hearings, but the regulations do provide that if there is a hearing the individual complainant

ment's claim that something major happened, when measured against the demonstration that something actually happened, is grossly lacking in the clarity that the public and minorities can understand.

In short, OFCC is still suffering from a paucity of credible achievements . . .

(S. Rep. No. 91–1137, Equal Employment Opportunities Act (1970), 20), the committee nonetheless "decided not to recommend such changes in the existing legislative structure at the present time" (*Id.*), thus leaving the federal contract compliance function with the OFCC rather than "overburdening" the Equal Employment Opportunity Commission with it. See also Hearings on S. 2453 Before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 91st Cong., 1st Sess. 37, 38, 92–98, 100, 114, 168–69, 194.

6. See 317 F.Supp. 379, 385, n. 5.

7. Our dissenting colleague accepts the position of plaintiffs that the administrative, including Title VII, remedies available do not provide "any realistic

possibility for the relief plaintiffs seek," adding that under these administrative procedures "the government participates in the form of judge or mediator, but a declaration of governmental duties and responsibilities is not contemplated by such procedures." First, considering that Congress and the Executive Branch labored long and hard to create just these procedures, we are reluctant to hold that all this was in vain because these remedies do not provide "any realistic possibility for the relief plaintiffs seek" in precisely those situations for which they were designed. At least we would not so hold on the showing made by plaintiffs here. Secondly, in the absence of final administrative action on plaintiffs' applications here, how can anyone be certain that a judicial declaration of governmental duties and responsibilities is required at all? In the interest of avoiding unnecessary, or duplicitous, governmental action, particularly in light of the crowded dockets confronting the judiciary at present, it would appear most sensible for the court to await final administrative action here before proceeding, if the need to do so still remains.

may participate in the administrative hearing, if he can show he has an interest in the proceeding and may contribute materially to the proper disposition thereof.[8] Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), should not discourage plaintiffs. As the trial court pointed out:

> There the Department of Health, Education and Welfare had "no procedures whereby welfare recipients may trigger and participate in the Department's review of state welfare programs." (397 U.S., at 406, 90 S.Ct. at 1215.) Such is not the case here.[9]

3. Plaintiffs further assert that in some (but not all) of the instances where revised contractual obligations have been put into effect following the compliance investigation triggered by the show-cause order, the new contracts have been refused to the plaintiffs on the grounds that these agreements are confidential. Whether this is true or not, we would assume that if a complaint were filed by the plaintiffs in regard to any one of these companies in this situation, the contract provisions would be a matter of relevant evidence at the hearing.

In the present posture of this case the plaintiffs came into the United States District Court without any administrative record whatsoever, for the apparent reason that plaintiffs had never pursued a complaint, if they had filed any in the first instance,[10] under the administrative procedures provided under Executive Order 11246 and the regulations pursuant thereto.[11] Administrative action should be pursued in cases like this one in view of the comprehensive administrative remedies available to the plaintiffs. Finality would be obtained by plaintiffs themselves presenting and pursuing complaints with the OFCC at whatever stage of the compliance agreement process.[12] We cannot say with exactitude what will occur if the plaintiffs go to the Office of Federal Contract Compliance and file a complaint in each of the eleven instances which they cited to the District Court and now cite to this court. But we are assured that one of several things will happen: (1) the Office of Federal Contract Compliance may actually reject the complaint on the ground that the matter has already been investigated, compliance assured, and the matter closed; (2) the OFCC may accept the complaint, reopen the investigation, but deny plaintiffs any role in such investigation by offering testimony or otherwise; or (3), the OFCC may reopen the investigation, conduct an open

---

8. 41 C.F.R. § 60–1.26(b).

9. 317 F.Supp., at 385.

10. See note 6, *supra.*

11. We are unable to appreciate plaintiffs' argument that pursuing their administrative remedy somehow involves much more labor on their part. Under a complaint filed with the Office of Federal Contract Compliance all plaintiffs need establish is that the accused company is in violation. Under the action brought in the District Court the plaintiffs by their own theory must establish (1) that the accused company is in violation, and that (2) the appropriate government officials have not taken required action. In the OFCC proceeding there is provision for appointed counsel for each complainant, 41 C.F.R. § 60–1.26(b), in addition to the reasonably expected action of the enforcement officials. Similarly, under a Title VII court action directed against the companies, dis-

cussed under III *infra,* comparative advantages would accrue to plaintiffs.

12. The plaintiffs' grievances might arise at any one of three stages: (1) Before any OFCC consideration or action with respect to plaintiffs' complaints; (2) During OFCC consideration or action; or (3) After OFCC consideration and action, in the form either of a finding of no discriminatory practices or acceptance by a company or companies of a compliance agreement, which plaintiffs find is insufficient or not being enforced. In any of these cases, complainants should at first attempt to make full use of the administrative remedies explicitly designed to provide the kind of relief which they seek here—elimination of discriminatory practices on the part of the companies. *Having once fully but unsuccessfully pursued the available administrative remedies, plaintiffs would have exhausted them and they would pose no bar to judicial consideration of the plaintiffs' complaints.*

hearing, in which plaintiffs are allowed to participate. In either eventuality, the plaintiffs will have definite administrative action to which to point when they then come into the United States District Court for review under the provisions of the Administrative Procedure Act.[13]

### B.

Turning now to plaintiffs' second argument against the applicability of the exhaustion doctrine here, the plaintiffs contend that whether their resort to administrative remedies would be useless or useful, they are not relegated to administrative remedies, but can seek redress originally in the federal courts for alleged violation of their constitutional rights by government officials. However, the Supreme Court cases cited by plaintiffs and the dissent here in support of this theory do not involve federal officials but do involve state or other non-federal officers, and furthermore were brought against such officials under the Civil Rights Act.[14]

13. Plaintiffs beg a further inadequacy, that they are not assured that the Administrative Procedure Act would give them judicial review of administrative action taken pursuant to regulations promulgated under an Executive Order, in contrast to statute. This bugaboo would seem to have been exorcised by Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

While the plaintiffs assert that there have been only three instances in the entire history of the OFCC program in which formal hearings were instituted for the purpose of debarring a government contractor (In Matter of Timken Roller Bearing Co., OFCC Docket No. 100–68; In Matter of Allen-Bradley Co., OFCC Docket No. 101–68; and In Matter of Bethlehem Steel Co., OFCC Docket No. 102–68), and that no contract has ever been cancelled, such hearings and subsequent debarment are not, of course, the only manner in which final administrative action may be obtained before judicial consideration is appropriate.

The dissent's assertion that filing a new complaint would merely be fruitless is not warranted in view of the scenario which we envision here. In the event that any of the three possible courses of action described above results, the plaintiffs will have final administrative action and will not have to bear the additional burden of asserting that the specific administrative remedies provided for the very situations involved here are meaningless. In addition, the statement by the dissent that the plaintiffs have been denied an opportunity to present their evidence is incorrect; in the first place, they may be able to present it before the OFCC. In the event they are not asked to do so and receive an adverse decision there, they may seek judicial review again, but this time with the advantage of having final administrative action to which they can point.

14. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967). See also 317 F.Supp. 379, 385 (1970). The dissent, in addition to the above-cited Supreme Court cases, cites Chisley v. Richland Parish School Board, 448 F.2d 1251 (5th Cir. 1971), and Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971), for the proposition that "the requirement of exhaustion is rapidly disappearing from that area of our jurisprudence dealing with the vindication of constitutional rights." This overlooks the fact, however, that the two Fifth Circuit cases he cites, as well as the three Supreme Court cases referred to above, are concerned with the question of the necessity for exhausting *state* judicial or administrative remedies prior to seking relief in the federal courts. *Chisley* involved a teacher's complaint that he had been dismissed solely because of his race, and the Fifth Circuit therein held that exhaustion of either *state* judicial or *state* administrative remedies was not a prerequisite to invoking the *federal right* provided by the Civil Rights Act of 1871. In *Hobbs*, involving a challenge to a provision prohibiting city firemen from taking an active part in primary elections and other political activities, the Fifth Circuit reached the same result with respect to the necessity of exhausting *state* judicial remedies before seeking *federal relief* under the 1871 Civil Rights Act. In addition, the dissent's reliance on United States v. Frazer, 317 F.Supp. 1079 (M.D.Ala.1970), for the proposition that the basic legal issue in that case and the one at bar is the same, is misplaced. As Judge Johnson himself recognized in *Frazer*, the remedy provided by Title VII, available to plaintiffs here, "defines the term 'employer' in such a manner as to exclude *states* or political subdivisions."

Aside from the fact that plaintiffs' theory is not supported in the cases cited, there are several affirmative reasons why plaintiffs should not be allowed to bring the action originally against these federal officials on this constitutional ground.

First, if the existence of Executive Order 11246 and the implementing regulations providing administrative enforcement of a nondiscrimination policy with government contractors is completely meaningless, it follows—and plaintiffs on oral argument candidly so agreed [15] —that whenever a government contractor is allegedly violating any other federal statute, then an original action in a federal court to compel the government department to cease doing business with the private company would lie as a means of enforcement of the statute (or constitutional provision) being violated. To read the due process clause as containing the remedy of government contract cancellation, available to be invoked by an aggrieved private party is a bit unprecedented. Unprecedented, and likewise fraught with the possibility of complete disruption of the usual procedures for statutory enforcement.

And unnecessary. Executive Order 11246, plus supporting comprehensive regulations, was tailored to afford a specific remedy for any violation of the due process clause by racial discrimination committed by government contractors. There is no need to construe the due process clause as containing any particular remedy and being virtually self-executing. The remedy provided by Executive Order 11246 is precisely what the plaintiffs seek here, and directed against the type violators, government contractors, by whose actions plaintiffs may be really aggrieved.

Finally, in view of plaintiffs' constitutional claims advanced in the instant case and the availability of alternate judicial and administrative remedies, it would be particularly inappropriate for this court to involve itself with such constitutional claims at this point. Involvement might well be unnecessary, if the plaintiffs pursued the range of alternatives available to them described above and immediately hereafter. As the Supreme Court stated in Aircraft & Diesel Corp. v. Hirsch:

[T]he very fact that constitutional issues are put forward constitutes a

(317 F.Supp., at 1082). The petitioners in the instant case have a range of administrative remedies carefully articulated by Congress and the Executive Branch to provide precisely the relief they seek, a situation vastly different from that confronting the petitioner, the United States, in *Frazer*.

15. The taped transcript of the oral argument reveals the following:
THE COURT: . . . If there were no Executive Order 11246 I take it you would still be here today . . .
PLAINTIFFS' COUNSEL [Mr. Sobol]: Yes, sir.
THE COURT: . . . arguing your constitutional right.
PLAINTIFFS' COUNSEL: Precisely.
THE COURT: Then this means that, to follow it along, in the absence of Executive Order 11246, making this a distinctive case, the theory—your constitutional theory—would still be valid, that you could come into court and ask the court to prohibit any government

agency [from] making purchases from any company that was in its conduct violating the Constitution.
PLAINTIFFS' COUNSEL: I would narrow our proposition a little—that the Government knew in its [the company's] employment practices was violating the Constitution. We don't reach the broader case.
* * * * *
THE COURT: Or, that the Government knew that the company had employment practices which violated the law.
PLAINTIFFS' COUNSEL: Yes, sir.
THE COURT: . . . That if the Government continues dealing with it, the company in violation of law, under the Constitution you can come in and ask the court to prohibit such government dealings.
PLAINTIFFS' COUNSEL: Yes, sir.
THE COURT: All right.
PLAINTIFFS' COUNSEL: Yes, sir. Thank you very much.

strong reason for not allowing this suit either to anticipate or to take the place of [a final alternative judicial or administration procedure]. When that has been done, it is possible that nothing will be left of appellant's claim, asserted both in this proceeding and in this cause, concerning which it will have basis for complaint.[16]

### III.

Our conclusion that plaintiffs should not be permitted to initiate an original court action, demanding the remedy of government contract termination with all companies found racially discriminating in employment practices, with the remedy derived directly from the due process clause, is reinforced by the existence of still another remedy to vindicate their rights unresorted to by plaintiffs. Recognizing that Title VII of the Civil Rights Act of 1964 is not an exclusive remedy,[17] and that the action is brought directly against the offending company rather than against government officials as plaintiffs have done here, still, if plaintiffs are interested in securing equal employment opportunities with private companies instead of litigating with government officials, this is precisely the purpose for which Title VII was designed.[18]

■ Indeed, two of the named plaintiffs have filed complaints with the Equal Employment Opportunity Commission, but, as the District Court noted,[19] they have not taken the next steps requisite to instituting civil actions against the companies. Whereas these two or any of the named plaintiffs, or any other employee or applicant, could file charges with the EEOC, and in the court if voluntary compliance were not secured by the Commission, they have not done so. Such Title VII suits may be class actions under Rule 23, F.R.Civ.P.[20] If the charges are proved, all the class plaintiffs can obtain complete relief from the asserted discriminatory employment practices. In so doing, plaintiffs could have the assistance of court-appointed counsel and bring the action without paying the usual fees.[21]

The manifest disinterest of plaintiffs in pursuing the effective remedies provided by Congress and the Executive can be explained only by their desire to create a hitherto unfound construction and implicit remedy in the Fifth Amendment due process clause, *i.e.*, private party class actions to compel government officials to terminate contracts with private companies having racially discriminatory practices without the benefit of any enabling statute or administrative procedure. To do so would be unwise, unprecedented, and in complete disregard of the carefully thought out remedies provided by both Congress and the Executive to vindicate plaintiffs' rights. The dismissal by the District Court is

**Affirmed.**

16. 331 U.S. 752, at 772, 67 S.Ct. 1493, at 1503, 91 L.Ed. 1796 (1947).

17. Local 12, United Rubber Workers v. NLRB, 368 F.2d 12 (5th Cir. 1966), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed. 2d 99 (1967); Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir. 1970); Sanders v. Dobbs House, Inc., 431 F.2d 1097 (5th Cir. 1970); and Section 706(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(b).

18. In fact, the Senate has recently passed and the House now has before it legislation which would expand the power of the EEOC by permitting it to seek injunctive relief itself in the federal district courts against those it finds to be engaging in discriminatory employment practices. H. R. 1746, 92d Cong., 2d Sess. as amended and passed Senate, 22 February 1972; 118 Cong.Rec. S2302–2306 (daily ed. 22 February 1972).

19. 317 F.Supp., at 387.

20. Oatis v. Crown Zellerbach Corporation, 398 F.2d 496 (5th Cir. 1968); Miller v. International Paper Company, 408 F.2d 283 (5th Cir. 1969).

21. 42 U.S.C. §§ 2000e–5(e) (k). We do not hold that plaintiffs must allege and prove that they themselves have been discriminated against. It is sufficient if they allege and prove discrimination against any members of the class they purport to represent.

JOHNSON, Chief District Judge (dissenting):

I respectfully dissent.

This action was brought against Melvin R. Laird as Secretary of Defense and Robert L. Kunzig as Administrator of the General Services Administration. The complaint sought (1) a declaratory judgment that the award of contracts by the defendants to racially discriminating companies and the failure to enforce the companies' contractual commitments to nondiscrimination have involved the federal government in discriminatory employment practices which thereby have violated plaintiffs' right to due process under the Fifth Amendment, and (2) an injunction prohibiting the defendants from awarding any further governmental contracts to the discriminating companies and requiring the cancellation or termination of existing contracts with these companies until such time as the discriminatory practices have been eliminated. Despite the clear import of this prayer for relief, the majority would relegate the plaintiffs to the pursuit of what I consider to be wholly inadequate administrative procedures.

There is no doubt that plaintiffs' ultimate goal is the end of what they allege are the racially discriminatory hiring and employment practices of the companies mentioned in this action. This case is a direct attempt to achieve that end. Here plaintiffs seek a declaration of the government's duty affirmatively to secure nondiscriminatory policies among governmental contractors who are being economically sustained by government contracts and public funds.

In my judgment the majority has misstated plaintiffs' case by characterizing it as seeking "either strict compliance with equal employment opportunity requirements or the disbarment of the offending companies from government contracts." Rather, the fundamental thrust of plaintiffs' action seeks a judicial declaration outlining the extent to which government officials who contract with companies that engage in racially discriminatory hiring and promotion practices must undertake to end racial discrimination by these companies. To put it more succinctly, plaintiffs are saying that these government officals have failed to fulfill their constitutional duty to contract with only nondiscriminatory companies and have thereby subsidized and continue to subsidize with federal funds widespread, blatant and continuing racial discrimination. Plaintiffs are seeking a judicial declaration of basic constitutional rights.

Neither administrative remedies under Executive Order 11246 nor those available under Title VII provide any realistic possibility for the relief plaintiffs seek. Those avenues are for the resolution of employee-employer conflict. Certainly under either procedure the government participates in the form of judge or mediator, but a declaration of governmental duties and responsibilities is not contemplated by such procedures. It may be that administrative remedies are available to government officials to force offending companies to cease such invidious practices. This fact, however, does not mean that the victims of such practices cannot litigate their rights in the federal judicial system.

Even assuming that the majority is correct that plaintiffs could theoretically gain relief through these administrative procedures, there is a strong countervailing consideration which suggests that such relegation in this case is neither required nor appropriate. It is that the requirement of exhaustion is rapidly disappearing from that area of our jurisprudence dealing with the vindication of constitutional rights. See Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961); Chisley v. Richland Parish School Board, 448 F.2d 1251 (5th Cir. 1971); Hobbs v. Thompson, 448 F. 2d 456 (5th Cir. 1971).

I get the impression that the majority may be saying that federal officials are

less obligated than their state counterparts to obey the Constitution; certainly, they are no more immune for their violations. *See* Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). While substantially different from a factual standpoint, the basic legal issue involved in United States of America by John N. Mitchell, Attorney General vs. John S. Frazer, as Director, Alabama Personnel Department, 317 F. Supp. 1079 (M.D.Ala.1970), regarding the duty of government officials to protect the rights of citizens against infringement by organizations being subsidized with federal funds, is substantially the same. In United States v. Frazer, the Court determined that the United States was subsidizing various programs that were being administered by the defendant State of Alabama officials. After making a finding of discrimination on the basis of race in hiring and promotional practices on the part of State officials, the Court observed, among other things, that:

> . . . Failure on the part of any of these Government officials to take legal action in the event that racial discrimination does exist would constitute dereliction of official duty.

> . . . Here, the United States is seeking to enforce the terms and conditions which Congress expressly imposed upon the expenditure of federal funds. To put it another way, the United States is merely attempting to enforce the express terms and conditions which the State of Alabama agreed to meet in receiving federal funds. . . .

In the case now before this Court, the only difference is that here the plaintiffs are the ones being discriminated against by the organizations receiving federal funds through various contracts with the United States government being administered by the defendants.

As for the fact that this case is brought under the Fifth Amendment, rather than 42 U.S.C. § 1983, the majority has simply stated a distinction without a difference. Since § 1983 applies only to state action, it is unavailable for challenges to federal officers. More fundamentally, the proper consideration for whether exhaustion is necessary is the similarity of the rights sought to be protected and the reasoning which justifies dispensing with administrative remedies, not the identity of the jurisdictional provision. The crucial factor is that in this case, as in the prior cases, the plaintiffs are seeking protection of or a declaration concerning basic constitutional rights allegedly infringed upon by government officials. There is no sound reason for concluding that an administrative agency is better equipped or more competent than the federal judiciary to determine the merits of plaintiffs' claims.

The majority has also failed to respond adequately to plaintiffs' contention that the administrative remedies are ineffective and unavailing. For example, it is clear from a reading of the regulations that under either the Executive Order or Title VII, the plaintiffs could file complaints against the offending companies. This would not, however, guarantee plaintiffs the right to participate in the agency proceedings, although they may be permitted to do so. They have no control whatever over the investigation or prosecution of the action. They must file the complaint and then hope for the best. I find this case sufficiently similar to Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), to render exhaustion inappropriate.

In addition, past practice demonstrates that without a judicial declaration of their duties under the Constitution, the defendant federal officials are unlikely to take the action plaintiffs desire. Plaintiffs alleged that as to at least four of the 11 firms involved here, the OFCC has investigated and found the companies to be discriminating. Yet no action for the protection of plaintiffs' rights has been taken. Administrative hearings have been held and the defendant officials continue to deal and con-

**314**

tract with the discriminating companies. The majority says that if the companies are still violating, then a new complaint can be filed. The mere suggestion of such redundancy, however, points out the fruitlessness of the action.

In sum, it seems to me to be highly ironic that this Court is relegating a claim of constitutional violation by federal officials to other federal administrators despite the fact that the administrators have already exhibited their disinterest in safeguarding plaintiffs' rights. It may be that the Fifth Amendment does not require the cancellation of contracts made by government officials with discriminating companies. Plaintiffs, however, have been denied an opportunity to present their evidence since the case went out in the district court without a hearing. I would remand the case for a hearing of the merits.