Jimmy L. McCALLUM, Plaintiff,

v.

Jimmy E. HINSON, Individually and as Fire Chief of the Macon-Bibb County Fire Department; Buckner F. Melton, Individually and as Mayor of the City of Macon, Georgia; and their successors in office, Defendants.

Civ. A. No. 79–116–MAC.

United States District Court,
M. D. Georgia,
Macon Division.

April 8, 1980.

David L. Mincey, Sylvia G. Haywood, Mincey & Kenmore, P. C., Macon, Ga., Harris Jacobs, Jacobs, Jacobs & Davis, Atlanta, Ga., for plaintiff.

Andrew W. McKenna, City Atty., Katherine M. Kalish, J. Michael Carpenter, Staff Attys., Macon, Ga., for defendants.

OWENS, Chief Judge:

Jimmy L. McCallum is one of many Macon firefighters who refused to work beginning July 6, 1972, because of a pay raise given to police officers but not to firemen. He and some 94 striking, suspended firemen—only 35 of whom, not including Jimmy L. McCallum, were reinstated by agreement—learned the hard way in this court that firemen have a First Amendment con-

stitutional right to be members of a union but do not have a right as employees of a Georgia municipal government, to strike. *Burnley v. Thompson*, Civil No. 2776 (MD Ga. Nov. 16, 1973), *aff'd* 524 F.2d 1233 (5th Cir. 1975).

Following the conclusion of that litigation, Jimmy L. McCallum was rehired as a Macon fireman without credit for his prior service.

On Sunday, March 18, 1979, McCallum had completed his required twelve months service in a probationary status and was a civil service protected member and employee of the fire department. Because of on the job back injuries his duty assignment was as fire inspector with the Fire Prevention Bureau rather than as a firefighter assigned to a particular fire station. That Sunday he and fellow fire inspector Randy Bishop, riding in McCallum's pick-up truck, stopped by four or five fire stations and talked with some of the firemen to urge them to join the local union. Jimmy McCallum was then and for about a year had been president, and Randy Bishop was secretary-treasurer of the local firefighters union which is affiliated with the International Association of Firefighters. Their Sunday visit and their discussion of union membership was reported by the captain of one of the fire stations to Fire Chief Jimmy E. Hinson.

The following Friday morning Chief Hinson called Inspector Bishop to his office and reprimanded him for soliciting union membership the preceding Sunday without having received permission from him, Chief Hinson, to do so.

Chief Smith, McCallum's supervisor, told McCallum in Bishop's presence that Chief Hinson wanted to see him after lunch. Bishop told McCallum of his morning meeting with Chief Hinson and suggested to McCallum "it would probably be good if we could tape the conversation to see what he says . . . ." Deposition of McCallum at 83. Bishop then borrowed a police department cassette recorder and tape from his

detective brother, showed McCallum how it operated and turned it over to him.

With the tape recorder concealed in his pocket and running, McCallum and Chief Smith met with Chief Hinson in Chief Hinson's office that afternoon. While much of that recording is inaudible, the audible portion considered in the light of all other evidence indicates that Chief Hinson then talked with McCallum about:

—McCallum and Tony Caldwell (former Macon fireman who is president of the Professional Fire Fighters Association of Georgia) talking with each other and with Keith Stringfellow, one of Macon's fifteen aldermen, about the fire department.

—a prior occasion on which Chief Hinson indicated he was seeking the city attorney's opinion about solicitation of union memberships and MaCallum said he wouldn't solicit until he heard from Chief Hinson or Mr. McKenna.

—that Keith Stringfellow had told Chief Hinson that if McCallum came back to work, he was going to leave union activity alone. Chief Hinson suggested that those like McCallum who were rehired were taken back as a result of William Whitehead, as negotiator, having agreed there would be no further union activity.

—Chief Hinson's intention to block further union activity. In particular Chief Hinson said, "You're trying to do the same damn thing all over again. You are trying to build that damn union back up again . . . and I ain't going to see it . . . I ain't going to see it built back up."

—about the possible effect of union activity on McCallum's job. Asked by McCallum, "are you saying if I solicit memberships to the union that I am jeopardizing my job?" Chief Hinson replied, "I ain't telling you nothing. I told you I was through [1] talking. I know what you told me in this [1] office, and don't tell me I didn't, and I know [1] [quite] well it was told them when they come back up there, and don't treat me like a[1] fool. And don't talk to me like I'm a [1] idiot and can't remember

1. Extreme profanity left out of quotation.

from one month to the next what somebody told me."

—about talking to Tony Caldwell and Keith Stringfellow in the future. Asked by McCallum, "Are you saying I can't talk to Tony Caldwell or Keith Stringfellow? Or any of them?" Chief Hinson replied, "If you talk to them at all about this job you'd better talk to me first. I will tell you that just as plain as I know how to tell you. If you don't believe it, try it."

—about Chief Hinson threatening McCallum. Told by McCallum, "But I'm not going to be threatened," Chief Hinson stated "I ain't threatening you," and McCallum said, "I think you have." Chief Hinson then said "I'm just telling you that's the damn chance—if you choose to go beyond it then go."

—about talking to Alderman or candidates even when they initiate the conversation. The chief strongly stated his view that there should be no conversation with Aldermen about the fire department in his absence and indicated he would not put up with it.

—collecting union dues with each fireman's permission through the credit union. In spite of past practices Chief Hinson stated he was opposed.

At the end the conversation was as follows:

"VOICE NO. 1:[2] Are you saying you've got a decision back from Mr. McKenna and he says—

"VOICE NO 2:[3] I'm saying you've got a chain of command in this organization and you just like the other 309 out there, you'd better damn well follow it.

"VOICE NO. 1: Yes sir, I will to the letter.

"VOICE NO. 2: If you don't then you damn sho' going to have to damn deal with them. If you decide you'd better go around it you had better make sure you've got enough of them up there to run my * * * off or I will come after you. And I don't know no other way to

explain it to you than that. And if you think I am sitting here talking to hear myself batting my gums, try it, because you ain't going to make a damn farce out of this damn office while I am here. I have seen it done—

"VOICE NO. 1: I won't even try to.

"VOICE NO. 2: Well you ain't.

"VOICE NO. 1: I wouldn't try to.

"VOICE NO. 2: You carried your * * * out there to try to get what is good for Jimmy McCallum and not another damn swinging * * * on this department, is all you've been out there for.

"VOICE NO. 1: I wish you would get your finger out of my face.

"VOICE NO. 2: You have went out there and the only person that had anything to benefit out of what you went for was you. And I am not in this job to present what is good for Jimmy McCallum. You've been here less than a year and you don't see no way that you can finagle a lieutenant's job out of it, and then by God you was going to put me to the wall.

"VOICE NO. 1: I was going under the guidelines.

"VOICE NO. 2: You may have pushed me to the wall where you ain't got a damn prayer.

"VOICE NO. 1: Can I leave?

"VOICE NO. 2: Yes."

(Transcript of taped conversation at 11–12).

After the meeting ended Jimmy McCallum over a period of several days copied and played the tape for Randy Bishop, his wife Bonnie; his father Lt. Virgil McCallum, a fire department supervisor; Tony Caldwell, President of the Professional Firefighters Association of Georgia, and Capt. Kevin McDaniel, a former supervisor of McCallum's. The recorder was returned to Detective Bishop. He also prepared a written grievance protesting the meeting and gave it to his superior Chief Smith. Chief Smith discussed the grievance with Chief Hinson and then returned it to

**2.** VOICE NO. 1 is Jimmy McCallum.

**3.** VOICE NO. 2 is Chief Hinson.

McCallum, advising at the same time that it was smoothed over. McCallum did not then formally file his grievance.

After the meeting with Chief Hinson there was no more solicitation of union membership in the fire station.

More than a month later—around April 27—Chief Hinson received a telephone call during which he was asked by a female voice if he knew his conversation with McCallum had been recorded. Following that telephone call he was given the tape recording by a female friend of McCallum's estranged wife. He played the tape, learned for the first time of its contents and then relieved McCallum from duty. The following letter was then sent to McCallum:

Inspector Jimmy L. McCallum

Route 1, Box 815

Lizella, Georgia

Dear Inspector McCallum:

On April 30, 1979, you were relieved from duty for violation of various ordinances of the City of Macon and rules and regulations of the Fire Department of the City of Macon.

You are hereby notified that you are being terminated from further employment from the Fire Department of the City of Macon effective seven (7) days from the date of this letter. If you desire to appeal this decision, you must notify the Director, Department of Personnel, City of Macon, within seven (7) days from the date of this letter. In the event you do appeal this decision, you will remain on unpaid suspension pending the outcome of the appeal.

The basis of this action is your violation of the Code of Ordinances of the City of Macon and Personnel Policies and Guidelines of the City of Macon as follows:

Code of Ordinances, Section 7–4076(d), "Disrespect to Superior Officers."

Code of Ordinances, Section 7–4076(k), "Conduct unbecoming a fireman and a gentleman."

Code of Ordinances, Section 7–4076(L), "Conduct Subversive of good order and the discipline of the department."

Specifically, the above three charges are the result of your actions in taping a private conversation between yourself and Chief Jimmy Hinson, without the permission of and without the knowledge of Chief Hinson. This action took place in Chief Hinson's private office on or about March 29, 1979. Chief Hinson was not informed of the existence of this taped private conversation until Friday, April 27, 1979.

Personnel Administrative Guideline Number 807 (Code of Conduct), Section V, Group III, Rule 2, "Deliberate *misuse*, destruction, or damaging of any City property or property of an employee."

This charge results from your improperly obtaining a City-owned recording device and tape, and using the device and tape for personal reasons.

Personnel Administrative Guideline Number 807, Section V, Group III, Rule 7, "Theft or *removal* from City locations without proper authorization *any* City property or property of any employee."

This charge results from you taking a City recording device and City tape away from City locations without proper authorization.

If you have any questions regarding your status or your appeal rights, you should contact the Director, Department of Personnel, City of Macon.

Sincerely,

/s/ Jimmy E. Hinson

JIMMY E. HINSON, Fire Chief

After unsuccessfully appealing administratively to the Disciplinary Hearing Board and on to Mayor Melton, McCallum filed his complaint in this court alleging that he has been unconstitutionally terminated from his civil service job because of his constitutionally protected union activities and in the alternative that the rules and regulations on which his dismissal was based are so vague and overbroad that they impinge on the constitutional rights possessed by him and all firemen and other employees of the City of Macon. The City of Macon says

that he was constitutionally and legally fired, that Macon's rules and regulations are valid and prays that the court so find.

Chief Hinson in his letter and his testimony states that the dismissal of McCallum results solely from McCallum tape recording their private conversation. In his letter Chief Hinson refers to every possible rule or regulation that would support his contention that the act of recording their private conversation without his consent, is a valid reason for dismissal. Is it?

■ While Chief Hinson, the members of the disciplinary board, then Mayor Melton and others may and do personally disapprove of the conversation between Hinson and McCallum in the presence of Smith being secretly recorded, there is nothing in the Constitution or laws of the United States or of this state that either criminally or civilly prohibits such recording.

As the Supreme Court of Georgia in 1977 said in deciding that it is not a crime for a party to a conversation to record it:

It is also contended that the interpretation given Code § 26–3001(a) by the court violates some right of privacy. We disagree. No contention is made that this Code section in any way attempts to prohibit the revelation of the content of a telephone conversation by one of the parties to it. *We have found no decision in any jurisdiction in the English speaking world that has made such a holding.* The reason for our holding is well set out in a federal court opinion involving a defendant who telephoned a plaintiff and by means of wire-tapping at defendant's end of the phone recorded the conversation without plaintiff's knowledge or consent. Later the conversation was broadcast over the radio. Considering plaintiff's right of privacy claim, the court held that it had not been violated:

"[The defendant] did not secretly listen to a conversation addressed to the ears of another. Thus, unless it is an invasion of a legally protected right of privacy for one party to a telephone conversation to reveal the content of that communication, wire-tapping by one party to a telephone

conversation for the purpose of such a revelation cannot be an illegal invasion of privacy. It is *unthinkable that the revelation of the content of a telephone conversation by one of the parties to it violates any legally protected right of privacy. Aside from a natural emotional revulsion which the use of such a device arouses, the fact of wire-tapping adds nothing to plaintiff's privacy claim."* *Chaplin v. National Broadcasting Co.,* 15 F.R.D. 134 (S.D.N.Y.1953). The Supreme Court of the United States has also held that no right of privacy is violated since either party to a telephone conversation may record the conversation and publish it; "The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone." *Rathbun v. United States,* 355 U.S. 107, 110, 78 S.Ct. 161, 163, 2 L.Ed.2d 134 (1957). See also *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

*Mitchell v. State,* 239 Ga. 3 at 4, 235 S.E.2d 509, 511 (1977).

Remove the word "telephone", substitute appropriate facts, and the answer is apparent:

"It is unthinkable that the revelation of the content of a conversation by one of the parties to it violates any legally protected right of privacy. Aside from a natural emotional revulsion which the use of such a device arouses, the fact of . . [unknown recording] adds nothing to . . . [Chief Hinson's] privacy claim. . . ."

By recording their conversation and playing it back for the people who heard it, Inspector McCallum did no more than any citizen does when he participates in a conversation with one person and then based upon his memory tells someone else what was said. Inspector McCallum did not do more than he would have done had he told other firemen of the conversation. Inspector McCallum by recording his and Chief Hinson's conversation did nothing unlawful.

Factually then this matter should be viewed and examined constitutionally and legally as if Fire Chief Hinson around April 27 learned for the first time that Inspector McCallum in carrying out his union activities had been telling Macon firemen from memory and in accurate detail of Chief Hinson's already described "I ain't going to see it [the local union] built back up" conversation; concluded that was "the straw that broke the camel's back;" and dismissed Inspector McCallum citing Macon's ordinances, personnel policies and guidelines. That he lawfully used a tape recording, the contents of which can't be disputed, instead of memory which is never as accurate as a recording and is always subject to dispute, is irrelevant to the question. It is the recounting of the chief's antiunion conversation rather than the means of recounting that was so disturbing to Chief Hinson. Chief Hinson in this court's judgment reasoned as follows—when the tape was first received by me around April 27, the tape was in a mutilated condition giving me the impression it had been played a lot. It was difficult to even play the tape but it was played. I then learned it was a recording of my anti-union conversation with Inspector McCallum. Having already concluded the tape had been played a lot it was then apparent to me that McCallum instead of ceasing his "build the union back up" activities as I plainly told him to do, had continued his union activities and as a part of those activities had been playing this tape to Macon firemen. The only way to stop McCallum's union activities is to dismiss him. Having so reasoned Chief Hinson wrote his letter of April 30 detailing other reasons—violation of ordinances, personnel policies and guidelines—as the basis for relieving McCallum from duty when the evidence shows Chief Hinson was relieving him from duty solely because of his continued union activities which the Chief was determined to stop. *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In common with all other employees of the City of Macon, firemen have a constitutionally protected right to participate in union activities as long as they do not strike or otherwise obstruct or interfere with the orderly performance of the duty that firemen, their supervisors, and the fire department have to protect the inhabitants of this community from fire. As the Supreme Court of the United States stated in 1945, ". . . the right . . . to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly. . . ." *Thomas v. Collins,* 323 U.S. 516 at 532, 65 S.Ct. 315, 324, 89 L.Ed. 430 at 441.

This constitutionally protected right is recognized by Section 91 of Macon's City Charter which specifically makes it lawful for any fireman to join a union, the local charter of which prohibits strikes and further prohibits any fireman from being penalized or discriminated against on account of membership in or affiliation with such a union. 1951 Ga.Laws 2399.

While Macon firemen have a constitutionally protected and city charter recognized right to participate in non-strike union activities, the City of Macon may nevertheless legally refuse to recognize and bargain with unions to which its firemen belong, 29 U.S.C. § 203(d) and (e), *Beauboeuf v. Delgado College,* 428 F.2d 470 (5th Cir. 1970); *Firefighters Local 574 v. Floyd,* 225 Ga. 625, 170 S.E.2d 394 (1969). While it may legally refuse to recognize or bargain with the local firefighters union, the City of Macon in the course of hiring, regulating conduct of, or firing employees, may not infringe upon its employees' constitutional rights, *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Perry v. Sindermann,* 408 U.S. 593, 33 L.Ed.2d 570, 92 S.Ct. 2694 (1972); *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970), to participate in non-strike union activities. Inspector McCallum's dismissal on account of his continued union activities was thus clearly in violation of his constitutionally protected right to participate in non-strike union activities.

The City of Macon urges that in spite of what Chief Hinson and Inspector McCallum said about unions, Inspector McCallum was aware of Macon's Code of Ordinances, Personnel Policies and Guidelines and clearly violated those enumerated in Chief Hinson's letter of April 30. In particular the City contends Inspector McCallum deliberately misused city property by borrowing and using a city owned tape recorder and tape. Inspector McCallum says all of the ordinances, personnel policies and guidelines are constitutionally invalid because they are vague, ambiguous, and overly broad. Are they?

In 1970 members of the local firefighters union sued the City of Macon in this court because of having been required pursuant to city ordinances to remove political candidates' bumper stickers from their personal automobiles. The Fifth Circuit Court of Appeals in examining those ordinances stated:

> The plaintiffs' primary complaint is that the Macon ordinance and charter provisions in question are on their face unconstitutionally vague and overbroad.
>
> At least as early as 1940, in response to the favored status of rights to expression and association in our constitutional scheme, the Supreme Court developed what has become known as the overbreadth doctrine. (citations omitted). This method of adjudication, wherein the courts review a particular law on its face without regard to the constitutional status of a particular claimant's conduct, is based on the principle that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." (citations omitted). Facial overbreadth scrutiny emphasizes the need to eliminate an overbroad law's deterrent impact on constitutionally protected expressive activity. . . . "Chilling effect" is a short-hand way of describing this vice of an overbroad law. Since by definition an overbroad statute covers some privileged as well as non-privileged

activity, the statutory burden operates as a disincentive to action and creates an *in terrorem* effect on conduct within the protection of the First Amendment. In the area of speech, the vagueness doctrine, based upon the principle that a statute must not forbid or require "the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322, reflects this same concern. Lack of fair warning to actors or lack of adequate standards to guide enforcers also may lead to a "chill" on privileged activity. A person contemplating action who might be covered by a vague statute is left in doubt as to whether he is covered by the statute and, if so, whether his claim of privilege will be upheld. (citations omitted).

> Rather than await case-by-case excision of a statute's overbreadth or vagueness through review of its application to particular conduct, which would be needlessly time-consuming and ineffective, courts, under the rubric of the overbreadth doctrine, invalidate the statute facially so as to end its deterrence of constitutionally protected activity. *Simply to review a statute as applied to the conduct of a particular claimant, while it might permit that individual to escape the statutory burden, would permit the overbroad law to remain as a deterrent to others who, because of fear of statutory reprisals, might forego protected activity rather than test their privilege administratively or judicially.*
>
> The overbreadth doctrine, therefore, focuses directly on the need for precision in legislative draftmanship to avoid conflict with First Amendment rights. Even though the interests a statute promotes may justify some infringement upon First Amendment rights, the overbreadth doctrine condemns those means to that legitimate end which comprehend too broad an incursion upon the realm of First Amendment activity. Where a law

is substantially overbroad, in that it sweeps within its scope a wide range of both protected and non-protected expressive activity, and where no "readily apparent construction suggests itself as a vehicle for rehabilitating the statute in a single [proceeding]," *Dombrowski v. Pfister, supra,* 380 U.S. [479] at 491, 85 S.Ct. [1116] at 1123 [14 L.Ed.2d 22], courts have rejected simple interest balancing and have required the legislature to achieve its ends by "less drastic means." *Shelton v. Tucker,* 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231; *accord, United States v. Robel,* 1967, 389 U.S. 258, 268 n. 20, 88 S.Ct. 419, 19 L.Ed.2d 508.

*Hobbs v. Thompson,* 448 F.2d 456, 459–460 (1971).

■ The ordinances, personnel policies and guidelines that must be examined are attached in their entirety as Exhibit "A". Note those referred to in Chief Hinson's letter:

Code of Ordinances § 7–4076(d), (k) and (*l*):

"Any member or employee of the fire department shall be subject to reprimand, deduction of pay, suspension from duty, reduction in rank, dismissal from the department, on any one or more of the said penalties, according to the nature and aggravation of his offense for any of the following causes, or for any violation of the rules, orders, regulations governing the department, or the charter provisions of the city governing said department:

\*       \*       \*       \*       \*       \*

(d) Disrespect to superior officers.

\*       \*       \*       \*       \*       \*

(k) Conduct unbecoming a fireman and a gentleman.

(*l*) Conduct subversive of good order and the discipline of the department."

Personnel Administrative Guideline # 807 which states that an employee may be disciplined for:

"2. Deliberate misuse, destruction, or damaging of any city property or property of an employee.

\*       \*       \*       \*       \*       \*

7. Theft or conversion of city revenues, material, equipment or tangible assets for personal use or gain. This includes the unauthorized use or removal of both city owned assets as well as employee owned assets."

It is patently obvious that these broad, indefinite, sweeping terms can be used to accuse any employee of almost anything his supervisor disapproves of. Their actual use in this case to try to justify Inspector McCallum's termination on account of his union activities is proof positive that they are capable of encompassing activity that is and is not constitutionally protected and sweep so broadly as to deter constitutionally protected activity.

Note other ordinance sections not here relied upon but equally overly broad and equally a deterrent to the exercise of protected rights: § 7–4071 Courtesy; § 7–4072 Members must pay just debts; § 7–4075 Obedience; § 7–4076(b), (c), (e), (f), (g), (h), (i), (m).

The protected rights focused upon are First Amendment rights which include free speech as well as participation in union activities. § 7–4076(m) includes suspension or discharge for "criticizing action of a superior officer before the committee." This obviously deters both constitutionally permissible criticism of one's superiors and impermissible criticism.

The City's entire Code of Conduct is likewise overly broad. Note just a few parts which are obvious infringements on First Amendment rights.

SECTION V—

11. Causing or participating in arguments with other employees which would tend to promote discord, or failure to cooperate with other employees which would hinder the performance of duties in a harmonious manner, or conducting one's self in a loud, unrully [sic], intimidating, or disorderly manner.

14. Engaging in horseplay, scuffling, wrestling, throwing things, malicious mischief, distracting the atten-

tion of others, catcalls, demonstrations on the job, or similar types of disorderly conduct.

SECTION VI—

4. Making or publishing of false, vicious or malicious statements concerning any employee, supervisor, the City or its operation.

8. Posting or removal of any matter on bulletin boards on City property at any time unless authorized by Department Head.

9. Distributing written or printed matter of any description on City premises unless authorized by Department Head.

10. Failure to report to Department Head or City Attorney a request for information or receipt of a subpoena from a law firm, court, or attorney (involving City affairs).

13. Refusal to give testimony in accident or internal investigation(s).

SECTION VIII—

Wanton and willful neglect in the performance of assigned duties.

8. Immoral, unlawful or improper conduct or indecency, either on or off the job which would tend to affect the employee's relationship to his/her fellow workers, his/her reputation or good will in the community.

12. Use or attempted use of a political influence or bribery to secure an advantage or any manner.

18. Interfering with a supervisor in the performance of his/her duties including discourtesy and/or public display of disrespect.

19. Discourtesy to individuals or groups of individuals with whom the employee comes in contact while in the performance of their work duties.

The General Rules and Regulations Governing the Fire Department include some already referred to—Rule 1(d), (k) and (*l*)—but also include other rules and regulations equally overly broad, to wit:

Rule 14.—Members of the department are strictly required, in their intercourse with each other, social or official, to observe courteous demeanor, and officers and men addressing each other will do so in a respectful manner.

Rule 19.—Political arguments are not permitted in or about the Stations.

Rule 29.—No solicitations will be tolerated, nor any subscription paper allowed to be circulated, nor any tickets for entertainments, raffels, etc., may be offered for sale in the department, except by permission from the Chief. Members of the department shall not be allowed to solicit subscriptions among citizens, for company or other purposes, without the permission of the Committee.

As the Fifth Circuit said in *Hobbs v. Thompson*, in speaking of political activity, also a First Amendment right:

██ It is true that the government may have a greater interest in regulating the political activities of its employees than it would have in regulating the political activities of the citizenry in general. For example, the government, as employer, has a legitimate interest in prohibiting public officials from using their authority to coerce their inferior employees into contributing to their campaigns. . . . Similarly, the government should be able to regulate activities which directly interfere with the proper performance of its employees' duties. However, since political speech has been referred to as "the essence of sef-government," [sic] *Garrison v. Louisiana*, 1964, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125, restrictions upon it should not lightly be imposed. The public should generally be able to speak on public issues free from fear of resulting criminal or civil penalties. . . . *New York Times* and related cases, of course, did not determine the precise extent to which the political expression and activities of public employees may be curtailed, but those cases do stand for the proposition that absent exceptional circumstances "debate on public issues should be uninhibited,

robust, and wide-open * * *." *New York Times v. Sullivan, supra*, 376 U.S. [254] at 270, 84 S.Ct. [710] at 721 [11 L.Ed.2d 686]. Since public employees make up an ever-increasing portion of the work force, a blanket prohibition upon political activity, not precisely confined to remedy specific evils, would deal a serious blow to the effective functioning of our democracy. In this area, the overbreadth doctrine plays an important role, for it requires the legislature to focus narrowly on the particular evils it wishes to combat when speech is at stake.

448 F.2d 456 at 470–71.

In spite of being thus told in 1971 that its rules and regulations must "focus narrowly on the particular evils it wishes to combat when speech is at stake," the City of Macon has continued to adopt and require its employees to obey its overly broad ordinances, rules and regulations.

The overbreadth test having been applied, the ordinances, code of conduct and rules and regulations in general and those in particular that are relied upon for the discharge of Jimmy L. McCallum are constitutionally invalid and may not be the basis for said discharge.

Having been unconstitutionally discharged for union activities, Jimmy L. McCallum must now be reinstated without loss of pay or benefits and the defendants are directed to do so this date.

SO ORDERED.

### EXHIBIT A

### August 24, 1979

This is to certify that the attached copy of Section 7–4067 of the Code of Ordinances of the City of Macon is a true and correct copy of said ordinance which is on file in the Clerk's Office of the City of Macon. This is to further certify that said Section 7–4067 was in full force and effect during all times complained of in the complaint of *Jimmie L. McCallum vs. the City of Macon* and specifi-

cally between the dates of 1962 through March 29, 1979.

/s/ James E. Hunnicutt
James E. Hunnicutt
City Clerk

### Section 7–4067 Solicitations.

No solicitations will be tolerated, nor any subscription paper allowed to be circulated, nor any tickets for entertainment, raffles, etc., may be offered for sale in the department, except by permission from the chief. Members and employees of the department shall not be allowed to solicit subscriptions among citizens, for company or other purposes, without the permission of the fire committee. (Code 1962, Sec. 2–173)

### EXHIBIT B

Rule 21.—Fatigue from duty at a previous fire will not be accepted as an excuse for failure to answer alarms.

Rule 22.—None of the apparatus of the Fire Department shall travel over lines of hose, unless in cases of absolute necessity.

Rule 23.—Racing to and from fires is strictly prohibited, and if the apparatus of several companies proceed on the same street to or from a fire, they shall do so in single file.

Rule 24.—When proceeding to fires the alarm on all apparatus will be sounded at short intervals, and always violently when approaching street corners.

Rule 25.—All proper dispatch will be used in reaching fires, consistent with safety.

Rule 26.—Captains and Drivers of Companies will be held responsible for any reckless or imprudent driving when turning corners, especially in crowded or slippery streets, and in such cases drivers will lessen speed.

Rule 27.—No intoxicating liquors will be kept or drunk in any of the houses or premises occupied by the department, nor shall any gambling with any instrument or device for money or any other article of value, be permitted.

Rule 28.—Smoking while on duty at fires, going to or returning from, is prohibited.

*Rule 29.—No solicitations will be tolerated, nor any subscription paper allowed to be circulated, nor any tickets for entertainments, raffels, etc, may be offered for sale in the department, except by permission from the Chief.* Members of the department shall not be allowed to solicit subscriptions among citizens, for company or other purposes, without the permission of the Committee.

Rule 30.—Members of the Department shall read and become familiar with the ordinances, rules and general orders of the department. They must conform to them promptly and cheerfully, obey such rules and orders, whether general, special or verbal, for the government of the department, and obedience must be prompt and faithful in every instance.

Rule 31.—When the Chief, or Assistant, or members of the Committee, shall visit quarters of the company for inspection purposes, the officer in charge will call his men to attention, and form them in single line. When the Chief approaches the Company shall salute him by touching the visor of their caps with the right hand.

Rule 32.—It shall be the duty of all members of the department in case they shall know of a violation of these rules, to report same to their superior officer, giving him names of members or members, and witness thereto, and the time and place thereof, as near as possible.

Rule 33.—Members of the Fire Department shall work what is known as the "Two Platoon" system, having a "Day Shift" and a "Night Shift". The Chief shall have the power to call all members into service in case of great threatening, General Alarms and other similar emergencies.

Rule 34.—It shall be the duty of all members of the Department to make Inspections of the downtown Business section of the city twice each year. And do any other work promptly and cheerfully assigned to them by the Chief.

## SECTION II

### DUTIES OF CHIEF

Rule 1.—The Chief of the Fire Department will be held responsible for the discipline, good order, proper conduct, care and management of the entire Fire Department.

Rule 2.—The Chief of the Fire Department shall have at all times general supervision, control and command of all officers, men, apparatus, material and property of the Fire Department, subject to such regulations as shall be prescribed by existing or future ordinances, and the Committee.

Rule 3.—The Chief, for individual instruction, government, and discipline of the men under him, may prescribe and establish from time to time such rules and regulations as he may deem advisable, subject to the approval of the Committee.

Rule 4.—He shall assign the officers and men to the Fire Stations and apparatus with which they are to serve.

Rule 5.—The Chief shall determine all cases of violation of any rule, regulation or orders, govern-

Printed from:

GENERAL RULES AND REGULATIONS
GOVERNING THE FIRE DEPARTMENT

Also in City of Macon

Code of Ordinances,

Section 7–4067

ACKNOWLEDGEMENT OF RECEIPT

I, _Jimmy Mc Cullion_ do hereby acknowledge that I have received a copy of The City of Macon Code of Conduct Rules. I further acknowledge that it is my responsibility to read these rules and ask my supervisor for clarification on any rule that I do not understand.

It is also my responsibility to discuss with my supervisor the specific Departmental Rules and Regulations that may not be covered in this Code of Conduct booklet.

SIGNED: _McCall_
(Employee)

_Fire_
(Department)

_7- 7- 77_
(Date)

EXHIBIT C

PERSONNEL ADMINISTRATIVE
GUIDELINE

EMPLOYEE FAIR TREATMENT

*SECTION I—GENERAL*

A. *Purpose*

The purpose of this Guideline is to enable City employees (or involuntarily terminated former employees) to bring job-related problems to the attention of the administration, and to provide an effective procedure for accomplishing solutions.

B. *Definitions*

1. *Involuntarily Terminated* : Former employees who were terminated by City for reasons other than retirement.

2. *Personnel Manager—Departments* : The member of the Director, Department of Personnel's staff who is assigned the responsibility of serving as Personnel Manager for the Department involved.

C. *Applicability*

All City of Macon employees.

D. *Responsibilities*

1. *Employee* : Within 5 work days of discovery of said unfair treatment or within 5 work days from date that said discovery could have been made by use of due diligence, the employee alleging unfair treatment shall first attempt to settle the controversy by conference with his/her immediate supervisor.

2. *Immediate Supervisor* : It is the supervisor's responsibility to treat all employees fairly and equally under the Personnel Policies and Guidelines of the City. In cases of misunderstandings or disagreements, it is important that the supervisor immediately enter into an open discussion of the issues with the employee in order to reach a fair and workable agreement or solution as soon as possible. Supervisors who refuse to counsel with the employee may be subject to disciplinary action.

3. *Department Heads* : It is the responsibility of the Department Heads to continuously review how policies and guidelines are being implemented in their organization to assure that all employees are receiving fair and equitable treatment. They are also responsible for reviewing complaints stated or written by employees in their organization and assisting in arriving at the most satisfactory agreement or solution possible under the conditions that exist.

4. *Director, Department of Personnel* : It is the responsibility of the Director, Department of Personnel and his staff to assist all levels of management in the interpretation and application of Personnel policies, guidelines and procedures in order to prevent unfair treatment of employees through improper application of the guidelines, procedures, etc. The Director, Department of Personnel will participate in Step # 4 of the Employee Fair Treatment Guideline.

5. *Equal Employment Opportunity Officer (Director, Department of Personnel* ): It is the responsibility of the Equal Employment Opportunity Officer and his/her staff to assist all levels of management in the development and application of Affirmative Action Programs and to directly review and recommend action on employee complaints, resulting from apparent discrimination against the employees of the City of Macon.

E. *References*

Employee Relations Policy Resolution of Council Personnel Management System Ordinance

*SECTION II—PROCEDURAL STEPS*

A. *Step 1*

Any employee who feels he/she has been unfairly treated should discuss it with his/her supervisor immediately after the occurrence of the incident giving rise to his/her feelings. The supervisor will receive all the facts and, within five (5) work days, give the employee involved a decision along with a full verbal explanation of the reasons for the decision.

—OR—

*Step 1—Alternate*

As an alternate first step, the employee may refer the matter to the Personnel Manager—Departments. The Personnel Manager—Departments, after investigating the matter, will arrange a meeting between the individual and his/her supervisor. The Personnel Manager—Departments may participate in the meeting should either of the parties desire. If the explanation made or the action taken does not satisfy the involved employee and he/she desires to carry the matter further, he/she will request the Personnel Manager—Departments to refer it to the next higher supervisor.

B.  *Step 2—Next Higher Supervisor*

1.  The "next higher supervisor" after proper study and review of all the pertinent information with the Personnel Manager—Departments, will meet with the employee involved within five (5) work days of the time the problem is referred to him. A decision will be given to the involved employee, after a thorough review of the facts, and within five (5) work days of their meeting.

2.  If the action taken by the "next higher supervisor" does not satisfy the employee, and he/she desires to carry the matter further, that supervisor and the individual will prepare and sign a joint statement of the issue. The Personnel Manager—Departments will be informed and, in turn, will send the file to the Department Head.

C.  *Step 3—Department Head and Personnel Manager—Departments*

The Department Head will meet with the individual involved and the Personnel Manager—Departments, within five (5) working days of receiving a written disagreement, to review it with the objective of taking appropriate action. The action taken will be confirmed in writing immediately.

D.  *Step 4—Department Head and Director, Department of Personnel*

If the involved employee is still not satisfied, the Department Head will no-tify the Director, Department of Personnel, who will review the facts with Department Head of the Department involved. The Director, Department of Personnel will review all facts of the alleged unfair treatment, request the presence of any person(s) who can contribute to the facts under study including the employee(s) who is requesting the correction of an unfair treatment. A final disposition will be confirmed in writing.

*SECTION III—MAYOR'S REVIEW*

The Chief Administrative Officer, as part of the Office of the Mayor, will review the decision reached at Step 4 and may request further hearings on the alleged unfair treatment before presenting the final decision to the Mayor with his/her recommendation for settlement. The employee will be informed of the decision reached by the mayor within 10 calendar days of receipt of the Step 4 proceedings.

*SECTION IV—ALTERNATE STEP (DISCRIMINATION)*

Any employee who feels he/she is being unfairly treated because of race, sex, age, color, religion, or national origin is encouraged to discuss his/her feelings with his/her immediate supervisor and work out a satisfactory solution; or, the employee may go directly to the Director, Department of Personnel, the Equal Employment Opportunity Officer for the City, and request assistance in rectifying what the employee feels is a discrimination. The Compliance Officer of the City will automatically be advised to investigate any discrimination complaints.

*SECTION V—TIME REQUIREMENTS*

Failure of the employee to comply with the time limits specified in this Employee Fair Treatment Guideline shall be deemed to be an abandonment of the Employee Fair Treatment request. If the involved supervisors fail to answer in any of the procedural steps within the time limits prescribed, the employee may automatically proceed to

the next step in the Employee Fair Treatment procedure; provided that such failure to answer within the prescribed time limits shall in no way amount to an admission by the supervisor that an Employee Fair Treatment request has merit. Time limits may be extended by mutual agreement of the parties involved.

*SECTION VI—FINAL DISPOSITION OF WRITTEN DISAGREEMENT OR MISUNDERSTANDING*

Written and satisfactorily answered disagreements or misunderstandings will be forwarded to the Personnel Manager—Departments. Written disagreements or misunderstandings are not to be placed in the employee's general personnel folder, but maintained in a separate file for statistical purposes only.

*Special Note: (Civil Service Employees)*

All employees may use the above procedure, but it is not intended to replace any employee rights now in effect under the Civil Service Section of the City Charter and Codes.

### EXHIBIT D
#### August 27, 1979

I, James E. Hunnicutt, City Clerk, do hereby certify that the attached copy of Section 7–4076(d) "Disrespect to Superior Officers", Section 7–4076(k) "Conduct unbecoming a fireman and a gentleman" and Section 7–4076(*l*) "Conduct subversive of good order and the discipline of the department" is a true and correct copy of the same as is on file in the Office of the City Clerk, Macon, Georgia and that the same were in full force and effect at all times complained of in the complaint of Jimmie McCallum vs. the City of Macon and specifically between the dates of 1962 and April 30, 1979.

/s/ James E. Hunnicutt
James E. Hunnicutt,
City Clerk

**Section 7–4070 Quarters.**

No sleeping or reclining in a position to indicate sleep will be allowed on the apparatus floor, except in single company sta-

tions where cots are allowed between hours of 9:00 p. m. and 6:00 a. m. Captains will see that all visitors are courteously received and escorted through the quarters but must not allow habitual lounging in or about the quarters. (Code 1962, Sec. 2–199)

**Section 7–4071 Courtesy.**

Members and employees of the department are strictly required in their intercourse with each other, social or official, to observe courteous demeanor, and in addressing each other will do so in a respectful manner. (Code 1962, Sec. 2–158)

**Section 7–4072 Members must pay just debts.**

Any member or employee of the department neglecting for an unreasonable length of time the payment of his just debts, and who may be ordered by the committee to pay the same, shall, at the time specified in such order show that said debt has been paid or be subject to suspension or discharge. (Code 1962, Sec. 2–149)

**Section 7–4073 Work hours.**

All members and employees shall be required to work such hours as may be prescribed by the fire committee from time to time. (Code 1962, Sec. 2–177)

**Section 7–4074 Fire committee orders.**

The fire committee may pass such orders from time to time as may be necessary to the proper handling of said department. (Code 1962, Sec. 2–178)

**Section 7–4075 Obedience.**

Members and employees of the department shall read and become familiar with the ordinance rules and general orders of the department. They must conform to them promptly, and cheerfully obey such rules and orders, whether general, special or verbal, for the government of the department, and obedience must be prompt and faithful in every instance. (Code 1962, Sec. 2–174)

**Section 7–4076 Suspension or dismissal.**

Any member or employee of the fire department shall be subject to reprimand, deduction of pay, suspension from duty, reduction in rank, dismissal from the department, on any one or more of the said penalties, according to the nature and aggrava-

tion of his offense for any of the following causes, or for any violation of the rules, orders or regulations governing the department, or the charter provisions of the city governing said department:

(a) Intoxication, while on or off duty.

(b) Wilful disobedience of orders.

(c) Indecent or profane language.

(d) Disrespect to superior officers.

(e) Leaving station, or while on duty at fires without just cause.

(f) Neglect in paying just debts after due notice from Committee.

(g) Immorality, indecency or lewdness.

(h) Incompetency, lack of energy and incapacity, mentally or physically.

(i) Neglect of duty.

(j) Violation of any criminal law.

(k) Conduct unbecoming a fireman and a gentleman.

(*l*) Conduct subversive of good order and the discipline of the department.

(m) Criticising action of a superior officer, or the committee.

(n) Smoking while at fires on active duty. (Code 1962, Sec. 2–145)

**Section 7–4077 Duty to report violations.**

It shall be the duty of all members and employees of the department in case they shall know of a violation of these rules, to report same to their superior officer, giving him name of the member or employee, and witnesses thereto, and the time and place thereof, as near as possible. (Code 1962, Sec. 2–176)

**Section 7–4078 Punishment for violation.**

Any member or employee, violating any of the rules, regulations or orders of said department, or any of the charter provisions of the city, governing said department, shall be punished according to the provisions of the ordinances governing said department and the city charter. (Code 1962, Sec. 2–179)

**Section 7–4079 Excusing violation of rules, prohibited.**

Superior officers are prohibited from excusing members or employees of the department for violating any of the rules and regulations and must report to the chief all derelictions that come to their notice. (Code 1962, Sec. 2–157)

**Section 7–4080 Resign, while charges pending, prohibited.**

No member of the department shall withdraw or resign while charges are pending against him, except by permission of the committee. (Code 1962, Sec. 2–156)

SECTION V—GROUP III RULES AND REGULATIONS AND RECOMMENDED STANDARD DISCIPLINE.

Normally, violations of Group III Rules and Regulations will be disciplined as follows:

1. Suspended pending discharge investigation.

Rules and Regulations that fall under Group III offenses would be (but not limited to) the following:

1. Wanton and willful neglect in the performance of assigned duties.

2. Deliberate misuse, destruction, or damaging of any City property or property of an employee.

3. Falsification of personal or City records including employment applications, accident records, purchase orders, time sheets, or other reports, records on applications, or work records.

4. Making false claims or misrepresentations in an attempt to obtain sickness or accident benefits, or workmen's compensation benefits.

5. Insubordination by the refusal to perform work assigned or to comply with written or verbal instructions of the supervisory force or discourtesy to persons with whom he/she comes in contact while in the performance of his/her duties.

6. Unauthorized possession of firearms, explosives, or weapons on City property.

7. Theft or removal from City locations without proper authorization *any* City property or property of any employee.

8. Immoral, unlawful, or improper conduct or indecency, either on or off the job which would tend to affect the employee's relationship to his/her job, his/her fellow workers, his/her reputation or good will in the community.

9. The use and/or sale of illegal narcotics in any form.

10. Permitting another person to use your City identification card or using another person's or altering a City identification card.

11. Proven incompetence or inefficiency in the performance of assigned duties in his/her position.

12. Use or attempted use of a political influence or bribery to secure an advantage of any manner.

13. Conviction or guilt of a felony, or a misdemeanor of the first degree as defined by Georgia Statutes, or any violation of a City Ordinance involving moral turpitude, while either on or off the job.